THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY ESCOBAR, Defendant-Appellant.

First District (4th Division) No. 84—2210

Opinion filed March 10, 1988.—Rehearing denied April 8, 1988.

McMORROW, J., dissenting.

David C. Thomas, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, James E. Fitzgerald, and Maria Burnett, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Defendant, Gregory Escobar, was convicted of murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2)) following a jury trial in the circuit court of Cook County. The trial judge sentenced defendant to the penitentiary for a term of 40 years.

Defendant now appeals, contending: (1) double jeopardy principles bar his being retried after a first trial ended in a mistrial, (2) the evidence adduced at his second trial was insufficient to prove him guilty beyond a reasonable doubt of murder, (3) the trial judge erred in denying his motion *in limine* to preclude any reference at trial to polygraph examinations, and that subsequent references at trial to polygraph examinations were prejudicial errors, and (4) his sentence was improper and excessive.

We affirm the judgment of the trial court.

BACKGROUND

Rudy Lozano and his family lived in the first-floor apartment of a two-flat building at 4035 West 25th Street in Chicago, Illinois. On the morning of June 8, 1983, Lozano was standing at his apartment door speaking with a male person. Minutes later, Lozano was fatally shot.

The alleged offender fled on a bicycle. During his flight, the offender rode by Domingo Ochoa.

Chicago police officers arrived on the scene and obtained a description of the offender from Ochoa. They also obtained what appeared to be a material fingerprint from the Lozano home.

An informant led police to believe that Ken Fuentes was responsible for the shooting. Fuentes lived on the second floor of a two-flat building with his brother and girlfriend, Livia Ortiz. On July 1, 1983, the police picked up Fuentes and took him to a police station. The police also obtained and tested a handgun belonging to Fuentes. Fuentes, at first, told the police that he had his gun on the day that Lozano was killed. Later, however, after he learned that he was a suspect in the Lozano shooting, Fuentes changed his story and told police that Alfredo Olvera had possession of his gun at the time of the shooting incident. Ortiz joined and agreed with Fuentes in both his original and revised stories.

Olvera was Fuentes' cousin. Olvera and his family lived in the first-floor apartment of Fuentes' building. The police also took Olvera into custody. Olvera subsequently implicated defendant, also his cousin, in the Lozano shooting. Olvera claimed that he gave Fuentes' gun to defendant on the day before the murder.

The police picked up defendant on the following evening, July 2, 1983. Without any police questioning, defendant volunteered that he owned a handgun and offered it to the police for testing. When the officers learned that the weapon was unregistered, they arrested defendant on a weapons violation charge. At the police station, officers interrogated defendant regarding the Lozano killing. After several hours of interrogation, defendant confessed to the alleged murder.

The police then placed defendant in a voice identification lineup. Lozano's wife could not identify defendant's voice as that of the offender. Further, in a visual lineup, Ochoa could not identify defendant as the offender who rode past him on a bicycle on the morning of the shooting.

Defendant's first trial began on April 4, 1984. Lozano's widow, Ochoa, Fuentes, his brother, Ortiz, several police officers, a ballistics expert, an assistant State's Attorney, and the county coroner testified for the State. Additionally, defendant's confession was read into evidence. The State's evidence is summarized as follows.

On June 7, 1983, the day before Lozano was killed, defendant overheard a conversation between Olvera and others. Olvera offered $5,000 to anyone to kill the victim, because of business dealings be-

tween himself and the victim that fell through. Olvera also extended his offer to defendant. Later that night, defendant obtained a handgun from Olvera. The handgun belonged to Fuentes. Defendant took the gun to his apartment that night.

On the morning of June 8, 1983, defendant went to Fuentes' apartment and obtained a blue 10-speed bicycle. He returned to his apartment and placed the pistol that he obtained from Olvera under his belt, covered by his shirt. Defendant then rode the bicycle to the victim's home.

At Lozano's building, defendant parked the bicycle against a fence. He went to the door of Lozano's apartment and knocked and rang the doorbell. The victim answered the door. Defendant asked the victim for permission to enter and then asked for a glass of water. Once inside, defendant thrice asked the victim for the whereabouts of his wife. After receiving his water, defendant put down the glass, took out the gun and shot Lozano three times at close range. Defendant exited the victim's apartment as he entered and fled on the bicycle to his own apartment.

Later that evening, defendant went to Olvera's apartment, returned Fuentes' gun, and asked for the $5,000 reward for killing Lozano. Olvera gave defendant $1,000 worth of cocaine as partial payment and promised to pay defendant the other $4,000 at a later date.

None of the State's witnesses placed defendant at the Lozano home on the date of the killing. Additionally, the bullets that killed Lozano matched Fuentes' gun and not the gun of defendant.

Defense witnesses were defendant himself and a fingerprint examiner. Defendant's evidence was essentially that he was at home and asleep on the morning of the slaying. Defendant confessed to the murder charge because police officers beat and abused him. Additionally, defendant's fingerprints did not match the fingerprint found in the Lozano household. The defense rested its case.

The record shows that the jury began its deliberations on April 10, 1984, after hearing closing arguments and receiving the trial judge's instructions. At about 3 p.m. that day, the jury sent a note to the trial judge. The jurors asked the judge if they should consider the State's "street files," which somehow had gotten into the jury room. Included within the "street files" were police reports, gang photographs, polygraph examination reports, witness statements, newspaper articles about the trial, and other items of what appeared to be inadmissible evidence. The street files were contained in a cart labelled on both sides "GANG CRIMES."

The trial judge asked the foreman to bring all of the material that

the jury viewed into his chambers. The foreman informed the judge that all of the jurors had examined all of the material. The foreman then returned to the jury room. The judge asked defense counsel if he should declare a mistrial because the jury had seen the inadmissible evidence. Defense counsel responded: "We'll just have to proceed. We don't want to jeopardize our client's position."

The trial judge called the jury into court. He questioned the jurors as to whether they could reach an impartial verdict. They responded in the affirmative. The trial judge again instructed the jury that it should consider only material admitted into evidence. He then ordered the jury to continue their deliberations.

The jurors were sequestered that evening. The next day, April 11, 1984, the jury deliberated from 9 a.m. to 6 p.m. The jury continued its deliberations the next day, April 12, 1984. At 10 a.m., the trial judge received a note from the jury stating that it was unable to reach a verdict. Defense counsel asked the judge to give the jury a *Prim* instruction, urging it to reach a verdict. (*People v. Prim* (1972), 53 Ill. 2d 62, 74-76, 289 N.E.2d 601, 608-10.) The trial judge refused the request. Instead, he, *sua sponte*, declared a mistrial. The judge did not make any further inquiries of the jury and did not discuss any other alternative with defense counsel.

Some time later, on April 24, 1984, defense counsel presented an objection to the trial judge's *sua sponte* declaration of a mistrial and moved to dismiss the cause based on double jeopardy grounds—that following the mistrial, another trial was legally barred. The trial judge denied defendant's request.

The record further shows that the second trial began on May 7, 1984. On May 10, 1984, based on the same evidence summarized above, the trial resulted in defendant being convicted of murder. The trial judge subsequently entered judgment on the verdict and sentenced defendant to a prison term of 40 years. Defendant appeals.

OPINION

I

■ Defendant first contends that his retrial violated the double jeopardy clauses contained in both the Federal and Illinois Constitutions. Those clauses guarantee that no person shall be put in jeopardy twice for the same offense. (U.S. Const., amend. V; Ill. Const. 1970, art. I, §10.) Defendant argues that since the trial judge in the instant case declared the mistrial after the jury was selected and sworn, jeopardy had attached and retrial was legally impossible. However, a mis-

trial order does not necessarily bar a second trial. We must examine the facts of this case to determine the validity of defendant's double jeopardy claim. *People ex rel. Roberts v. Orenic* (1981), 88 Ill. 2d 502, 507-08, 431 N.E.2d 353, 356.

There is no barrier to reprosecution if the mistrial was attributable to the defendant, by virtue of his or her motion or consent. In *United States v. Jorn* (1971), 400 U.S. 470, 27 L. Ed. 2d 543, 91 S. Ct. 547, the United States Supreme Court described the applicable standard:

> "[W]here circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." 400 U.S. at 485, 27 L. Ed. 2d at 556, 91 S. Ct. at 557, quoted in *Orenic*, 88 Ill. 2d at 508, 431 N.E.2d at 357.

### A

Defendant argues that he did not consent to the mistrial. He contends, rather, that he made a timely objection. As discussed above, the jury began its deliberations on April 10, 1984. Later that day, the trial judge learned that the jury examined the street files, determined that each juror still could reach an impartial verdict, and ordered them to continue their deliberations. The jury deliberated all of the next day.

On the morning of April 12, 1984, the trial judge received a note from the jury stating, "We would like to come back into court. We cannot reach a unanimous verdict." The trial judge called out the jury and ascertained that the jury was deadlocked and had no hopes of reaching a verdict. The trial judge then stated, "Okay. Just go back to the jury room for a few seconds. I'll have you right back out." The record shows that the following proceedings then took place:

> "THE COURT: Attorneys?
>
> [Defense Counsel]: My suggestion would be to Prim the jury.
>
> THE COURT: We're wasting our time.
>
> [Defense Counsel]: We've locked them up. There was a lot of evidence talked about. We could at least allow them to deliberate shortly, to see—perhaps have a hearing on the Prim Instruction.
>
> THE COURT: In light of what went on, what went back to the jury room and everything else, I'm going to declare a mistrial. Bring them out.

[The jurors were brought out.]

THE COURT: Okay. You may be seated. Since you were unable to reach a verdict now after approximately a day, day and a half, or whatever period of time you have been out, we'll declare a mistrial and a hung jury, and another jury will have to decide it. You may go back to the jury room. Jurors withdrawn. Mistrial declared. Thank you.

\* \* \*

THE COURT: Okay. We'll recess. We'll wait until 10:00 o'clock and start the rest of the call.

\* \* \*

THE CLERK: State of Illinois versus Gregory Escobar.

[Defense Counsel]: Present before the bench is the defendant Gregory Escobar.

THE COURT: Let's hold it on for a week and we'll see what we want to do.

[Defense Counsel]: Not for trial, but—

THE COURT: No, to set a trial date, for any motions you want to make or whatever.

\* \* \*

[Defense Counsel]: The 19th, Judge?

\* \* \*

THE COURT: By agreement 4-19, \*\*\*."

The record further shows that the following proceedings occurred on April 19, 1984:

"THE CLERK: The People of the State of Illinois versus Gregory Escobar.

[Defense Counsel]: \*\*\* At this time I'd ask leave to file our Motion to Dismiss. I've tendered a copy to the prosecution. If it would be convenient with the Court, I ask that it be held over.

[Prosecutor]: Fine, Judge.

THE COURT: We'll hold it on until Tuesday, and I'll rule upon it Tuesday, which would be the 24th. By agreement?

[Defense Counsel]: Yes, sir.

THE COURT: By agreement, then."

The record further shows that on April 24, 1984, defense counsel finally argued his motion to dismiss the cause, raising the double jeopardy claim. The trial court denied the motion.

■ Defendant presents three alternative arguments as to why a retrial was legally inappropriate. He first contends that he made a timely objection, on double jeopardy grounds, to the trial judge's declaration of a mistrial. He argues that his suggestion to give the jury a

*Prim* instruction constituted a timely objection. We disagree. The purpose of the timely objection requirement here is to notify the trial judge of the double jeopardy issue, thereby giving the judge an opportunity to avoid or correct the error. At no time did defense counsel speak of double jeopardy during his brief colloquy with the trial judge. The suggestion of a *Prim* instruction, alone, is insufficient notice.

■ Defendant next contends that the trial judge did not give him an opportunity to object on double jeopardy grounds. Defendant argues that the trial judge, *sua sponte*, declared the mistrial immediately after defense counsel suggested the *Prim* instruction. Defendant notes additionally that immediately after the declaration, the trial judge further ordered a recess before defense counsel could make any objections. Defense argues that the April 24, 1984, hearing was the earliest available opportunity for defense counsel to raise his double jeopardy claim.

The record shows, however, that defense counsel had ample time to raise a double jeopardy objection before the trial judge declared a mistrial. Before he called the jury into the courtroom, the trial judge stated that he was going to declare a mistrial. The jurors were then brought out. The trial judge then declared a mistrial. Defense counsel could have raised his double jeopardy objection during this interval, but instead, he stood mute.

We additionally note that the trial court's series of continuances until April 24, 1984, was no excuse for defendant's failing to raise a timely double jeopardy objection. Defendant agreed to the continuances. A defendant "may not sit idly by and allow alleged irregular proceedings to occur without objection, and afterward seek to reverse his conviction by reason of those same irregularities." *People v. Mays* (1962), 23 Ill. 2d 520, 525-26, 179 N.E.2d 654, 656.

Defendant also erroneously contends that his silence, before the trial judge declared the mistrial, did not constitute consent. Defendant relies on *People v. Camden* (1986), 140 Ill. App. 3d 480, 488 N.E.2d 1082, where the Appellate Court for the Fifth District held, as a matter of law, that mere silence does not constitute consent to a mistrial. (140 Ill. App. 3d at 485, 488 N.E.2d at 1085.) Our supreme court, however, reversed the appellate court and specifically held that a defendant's failure to object to a mistrial, despite having an adequate opportunity to do so, and his course of conduct after the declaration of the mistrial, can constitute acquiescence to the mistrial. *People v. Camden* (1987), 115 Ill. 2d 369, 378-79, 504 N.E.2d 96, 100.

Applying the above principles to the instant case, we conclude that defendant's conduct constituted acquiescence to the mistrial. We

hold, therefore, that defendant implicitly consented to the mistrial order.

## B

■ Defendant also contends that the State was guilty of over-reaching at his first trial. Prosecutorial or judicial overreaching is a bar to retrial, whether or not a defendant consented to the mistrial. (*United States v. Jorn* (1971), 400 U.S. 470, 485, 27 L. Ed. 2d 543, 556, 91 S. Ct. 547, 557.) "Overreaching" is prosecutorial or judicial misconduct: (1) specifically designed to provoke a mistrial in order to obtain a second, and perhaps more favorable, opportunity to convict the accused. Further, overreaching is established by the trial judge making a finding of fact. *Oregon v. Kennedy* (1982), 456 U.S. 667, 72 L. Ed. 2d 416, 102 S. Ct. 2083.

■ Defendant contends that the State intentionally allowed the jury to view the street files. Defendant notes that the material was in the State's evidence cart. Defendant further notes that he never had access to the State's files; the State had sole possession and complete control of the material. Defendant concludes, therefore, that the State intended the jury to view the material and that such conduct constituted overreaching.

After reviewing the record, we conclude that no overreaching of any kind was present in defendant's first trial. The experienced trial judge specifically found that neither the State nor any person intentionally sent the street files into the jury room. The weight of the evidence supports his finding. In conclusion, we hold that double jeopardy principles did not bar the reprosecution of defendant.

## II

Defendant next claims that all of the evidence adduced at the second trial, including his confession, was insufficient to prove him guilty beyond a reasonable doubt of murder. He contends that: (a) his confession was involuntary, and (b) all of the remaining evidence was insufficient to corroborate his confession.

## A

■ During his second trial, defendant challenged the voluntariness of his confession. He argued that the police never advised him of his right to counsel, handcuffed him to a wall and beat him, interrogated him for 15 hours, and confronted him (18 years old) with two older police officers, urging him to confess.

An individual who is subjected to custodial police interrogation

concerning matters that might tend to incriminate him is entitled to the procedural safeguards that the United States Supreme Court outlined in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. The person interrogated may waive these rights, but a heavy burden rests on the State to show that he waived his constitutional rights knowingly and intelligently. (384 U. S. at 475, 16 L. Ed. 2d at 724, 86 S. Ct. at 1628.) We must, therefore, initially determine whether defendant knowingly, intelligently, and voluntarily waived these rights. *People v. Martin* (1984), 102 Ill. 2d 412, 426, 466 N.E.2d 228, 234.

Whether a defendant makes a statement voluntarily depends on the totality of the circumstances. The test is whether the defendant made the statement freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. Our standard of review is not the criminal standard of beyond a reasonable doubt, but rather, that of manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606, cited in *Martin*, 102 Ill. 2d at 426-27, 466 N.E.2d at 234.

■ After reviewing the record, we conclude that defendant voluntarily confessed to the murder. The record shows that the police gave defendant his *Miranda* warnings before they questioned him. Police officers testified that they brought defendant to the station between 6:30 p.m. and 7 p.m. on July 2, 1983. At approximately 7:30 p.m., police officers gave defendant his *Miranda* warnings and then questioned him for only 10 minutes. The record further shows that the police took defendant to another station at around 10:30 p.m., but returned him at approximately 1:15 a.m. A police officer gave food to defendant at around 1:30 a.m.

Between 1:30 a.m. and 2 a.m., police officers again gave defendant his *Miranda* warnings. The police then told defendant Olvera implicated him in the murder. Defendant denied Olvera's allegations and the officers left the room. At approximately 2:30 a.m., the police brought Olvera and Fuentes to speak with defendant. Defendant reacted violently. Olvera and Fuentes left defendant, whom police then photographed and fingerprinted.

At approximately 3:15 a.m., police officers again gave defendant his *Miranda* warnings. Defendant then confessed to the murder. Defendant then repeated the confession so that a police officer could take notes. An assistant State's Attorney arrived at the station at 6 a.m. to hear defendant's confession, after advising defendant of his rights. The record contains no evidence that the police tortured or co-

erced defendant in any way. We conclude, therefore, that the manifest weight of the evidence supports the voluntariness of defendant's confession.

## B

Defendant further contends that the evidence adduced at trial was insufficient to corroborate his confession. Defendant argues that the State's evidence was entirely circumstantial. He stresses that no witness saw him shoot the victim or even saw him at the victim's home. Further, defendant did not possess the murder weapon at the time of his arrest.

■ For a conviction based on a confession to be upheld, the confession must be corroborated. In Illinois, proof of the *corpus delicti* satisfies the corroboration requirement. (*People v. Willingham* (1982), 89 Ill. 2d 352, 358-59, 432 N.E.2d 861, 864.) The *corpus delicti* is the body or substance of a crime, which ordinarily includes the act and the criminal agency. *People v. Lambert* (1984), 104 Ill. 2d 375, 378, 472 N.E.2d 427, 428.

The State cannot prove the *corpus delicti* by defendant's confession alone. There must be some independent evidence or corroborating evidence outside of the confession which tends to establish that a crime occurred. If such evidence exists, and that evidence tends to prove that the offense occurred, then that evidence, if it corroborates the facts contained in the defendant's confession, may be considered together with the confession to establish the *corpus delicti*. (104 Ill. 2d at 378-79, 472 N.E.2d at 428-29, citing *Willingham*, 89 Ill. 2d at 359-61, 432 N.E.2d at 864-65.) We add that the corroborating evidence can be entirely circumstantial. *People v. Lueder* (1954), 3 Ill. 2d 487, 488, 121 N.E.2d 743, 744.

■ The *corpus delicti* for the crime of murder is the fact of death and the fact that the death was produced by the criminal agency of some person. (*People v. Melquist* (1962), 26 Ill. 2d 22, 28, 185 N.E.2d 825, 828-29.) The record contains, of course, sufficient evidence to establish the *corpus delicti* for murder. The victim's body was found, shot three times at close range. Further, the same evidence, with the other evidence adduced at trial, corroborated the facts contained in defendant's confession. We hold that the State established the *corpus delicti* and that the trial judge did not err in admitting defendant's confession.

■ We additionally note that this cause was tried to a jury. Our courts have "often held that it is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to

their testimony and the inferences to be drawn from the evidence."
(*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733, 734.) As a
result we will not set aside a jury verdict unless it is palpably con-
trary to the weight of the evidence, or so unsatisfactory as to justify
a reasonable doubt of guilt. (*People v. Hairston* (1970), 46 Ill. 2d 348,
366, 263 N.E.2d 840, 851.) After reviewing all of the evidence, we
conclude that defendant was proved guilty beyond a reasonable doubt
of murder.

## III

Defendant next contends that the trial judge abused his discretion
by (a) denying his motion *in limine* to preclude any reference at his
second trial to polygraph examinations, and (b) allowing the jury to
hear such references at trial.

## A

During the first trial, a State's witness made a reference to
defendant's taking of a polygraph examination. As a result, defendant
presented to the trial judge a motion *in limine* to preclude any refer-
ence to polygraph examinations at his second trial. The trial judge de-
nied the motion.

A motion *in limine* is addressed to the trial court's inherent
power to admit or exclude evidence. If the rules of evidence do not
require exclusion of the disputed material, then the trial judge must
deny the motion. If the material should be excluded, however, the
trial judge has the discretion to either grant or deny the motion. (*Peo-
ple v. Williams* (1978), 60 Ill. App. 3d 529, 533, 377 N.E.2d 367, 370.)
A trial judge has the discretion to reserve ruling on evidentiary mat-
ters until they are presented at trial. (*People v. Riper* (1970), 127 Ill.
App. 2d 394, 398, 262 N.E.2d 141, 144.) A court of review will not
reverse a trial judge's grant or denial of a motion *in limine* absent a
manifest abuse of discretion. *Williams*, 60 Ill. App. 3d at 532, 377
N.E.2d at 370.

In the instant case, we cannot say that the trial judge mani-
festly abused his discretion. The one reference to a polygraph exami-
nation during the first trial was made during defendant's cross-exami-
nation of a State's witness. It was well within the trial judge's
discretion, therefore, to deny the motion and rule on the matter only
if presented at the second trial.

## B

We next consider the effect of the references to polygraph exami-

nations in defendant's second trial. There were two. Fuentes, during his direct examination, testified initially that his handgun, the murder weapon, was in his possession at the time of the murder. However, after the police told Fuentes that his gun was the murder weapon, he remembered that he loaned the gun to defendant. During cross-examination, defense counsel stressed Fuentes' change of story. On redirect, the prosecutor asked Fuentes how he remembered that he did not have the gun on the day of the murder. In answering the question, Fuentes recounted the events of the day that he was questioned, including a brief reference to his taking a polygraph examination.

Polygraph evidence is inadmissible in Illinois, even by stipulation. (*People v. Baynes* (1981), 88 Ill. 2d 225, 240, 430 N.E.2d 1070, 1077.) Further, the proscription of its use, by any means, applies to any participant in the trial process, be it judge or jury. *People v. Yarbrough* (1982), 93 Ill. 2d 421, 426-27, 444 N.E.2d 493, 495.

Defendant now contends that he did not solicit Fuentes' reference to the polygraph examination. Defendant argues that he was questioning Fuentes why he had changed his story, and that the answer to that had nothing to do with a polygraph examination. We disagree.

The trial court ruled that Fuentes' remarks resulted from defense counsel's "persistent questions." Both the record and the applicable law support the trial judge's ruling. A defendant cannot complain of the admission of testimony which was invited by the defendant's own trial tactics. Further, a defendant who procures or invites the admission of evidence, even though it be improper, cannot be heard to complain about it on appeal. *People v. Jones* (1983), 119 Ill. App. 3d 615, 628, 456 N.E.2d 926, 936-37.

In the instant case, Fuentes merely recounted the events surrounding his change of story. One of these events was his polygraph examination. It would not have come out, but for defense counsel's questioning in this specific area. Defendant cannot now complain of the invited testimony.

Also, during closing argument, the prosecutor recounted Fuentes' testimony, including the reference to the polygraph examination. The State claims that defendant waived this issue on appeal because he failed to object during closing argument. Defendant claims that his unsuccessful motion *in limine* preserved the issue for review. This is error. A motion *in limine* does not preserve evidentiary questions for review. *People v. Armstrong* (1983), 111 Ill. App. 3d 471, 478-79, 444 N.E.2d 276, 281.

Supreme Court Rule 615(a), however, provides an exception to the rule of waiver where there has been "plain error." (107 Ill. 2d R.

615(a).) Under this rule, we may elect to consider errors that have not been properly preserved for review where the evidence at trial is closely balanced or where the errors were of such magnitude that a defendant was denied a fair trial. (*People v. Lucas* (1981), 88 Ill. 2d 245, 250-51, 430 N.E.2d 1091, 1093-94.) The admission of polygraph evidence is reviewable under the plain error rule. *People v. Baynes* (1981), 88 Ill. 2d 225, 244-45, 430 N.E.2d 1070, 1079.

■■ After carefully reviewing the record, we conclude that the strength of the State's evidence rendered harmless the prosecutor's erroneous remark. *People v. Poliquin* (1981), 97 Ill. App. 3d 122, 133, 421 N.E.2d 1362, 1371.

## IV

Defendant lastly contends that the trial judge abused his discretion in imposing a 40-year prison sentence because (a) the trial judge violated provisions of the Criminal Code, and (b) his sentence was excessive.

## A

■■ Defendant first contends that section 5—5—3.2 of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2) provides for aggravating factors that must be present in a case before a trial judge can impose a sentence greater than the statutory minimum. Defendant argues that none of these factors were present in his case and, therefore, he should receive a new sentencing hearing.

Defendant misreads the statute. Defendant's 40-year prison sentence was within the statutory range. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(a).) Section 5—5—3.2, upon which defendant relies, explicitly states that a trial judge must consider these aggravating factors "as reasons to impose a more severe sentence under Section 5—8—1." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2.) Since defendant's sentence was within the statutory range, section 5—5—3.2 does not apply.

Relying on section 5—4—1(c) of the Unified Code of Corrections, defendant contends that the trial judge erred also by not specifying on the record the factors it considered in determining his sentence. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—4—1(c).) This contention fails. Our supreme court has held this section to be directory rather than mandatory. *People v. Davis* (1982), 93 Ill. 2d 155, 162, 442 N.E.2d 855, 858.

## B

 Defendant also contends that his 40-year prison sentence was excessive. Defendant points to his age and lack of prior convictions.

Supreme Court Rule 615(b)(4) authorizes this court to reduce a criminal sentence. (107 Ill. 2d R. 615(b)(4).) However, a sentencing decision is a matter of judicial discretion and, so long as the sentence is within the statutory limits, we hesitate to exercise our power to reduce it absent a finding that the trial court abused its discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.) The trial judge is normally in a better position to determine punishment than a reviewing court. A trial judge properly bases a sentence on the particular circumstances of each individual case, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. The trial judge has the superior opportunity to consider these factors; we have before us only the cold record. 68 Ill. 2d at 154, 368 N.E.2d at 884.

Further, "[a] rebuttable presumption arises that the sentence imposed was proper and is only overcome by an affirmative showing that the sentence imposed varies greatly from the purposes and spirit of the law or is manifestly violative of constitutional guidelines." *People v. Jenkins* (1984), 128 Ill. App. 3d 853, 857, 471 N.E.2d 647, 650, citing *People v. Gallardo* (1983), 112 Ill. App. 3d 764, 775-76, 445 N.E.2d 1213, 1222.

After reviewing the record in the instant case, we cannot say that the trial judge abused his discretion. The trial judge sentenced defendant to 40 years in the penitentiary. As we noted earlier, this was within the statutory range. The record shows that the trial judge considered many different factors before imposing sentence. We hold that defendant's prison sentence of 40 years was proper and not excessive.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON, J., concurs.

JUSTICE McMORROW, dissenting:

I respectfully dissent for three reasons. First, the record demonstrates that there was no manifest necessity for the trial court's *sua sponte* mistrial declaration at defendant's first trial. The judge specifically refused to pursue viable alternatives to mistrial requested by the

defendant and did not consider any other measures short of mistrial. Second, the record shows, contrary to the majority's assertion, that defendant did not acquiesce in or consent to the mistrial declaration, and presented his motion to bar further proceedings in a timely fashion. There is also no evidentiary support for the trial court's finding that no overreaching by the State occurred in the instant case. Third, prejudicial and reversible error occurred when evidence that a material State's witness had taken a polygraph examination was introduced during defendant's second trial, emphasized by the State during closing argument, and relied upon by the trial court in its denial of defendant's post-trial motion for a new trial.

## I. DOUBLE JEOPARDY

### A. MANIFEST NECESSITY

Under the double jeopardy clause of the fifth amendment to the United States Constitution, no "person shall be subject for the same offense to be twice put in jeopardy of life or limb." (U.S. Const., amend. V; *Benton v. Maryland* (1969), 395 U.S. 784, 23 L. Ed. 2d 707, 89 S. Ct. 2056.) Where a defendant has not consented to the mistrial, there must be a "manifest necessity" for the trial court's mistrial declaration. (*United States v. Perez* (1824), 22 U.S. (9 Wheat.) 579, 580, 6 L. Ed. 165, 165.) This "manifest necessity" rule "stand[s] as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the [process]." *United States v. Jorn* (1971), 400 U.S. 470, 485, 27 L. Ed. 2d 543, 557, 91 S. Ct. 547, 557.

Thus, manifest necessity for declaration of a mistrial must be founded upon "very plain and obvious causes" (*United States v. Perez* (1824), 22 U.S. (9 Wheat.) 579, 580, 6 L. Ed. 165, 165) and "[a]ll possible alternatives to a mistrial must be considered, employed and found wanting before declaration of a mistrial over the defendant's objection is justified" (*State v. Pugliese* (1980), 120 N.H. 728, 730, 422 A.2d 1319, 1321, citing *Jorn*, 400 U.S. at 486-87, 27 L. Ed. 2d at 557-58, 91 S. Ct. 557-58; *United States v. Kin Ping Cheung* (5th Cir. 1973), 485 F.2d 689, 691). "A precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial, would tend to indicate insufficient concern for the defendant's constitutional protection. [Citations.] Hence, although a reviewing court may defer to the trial court's discretion to make a mistrial decision, '[i]f the record reveals that the trial judge has failed to exercise the "sound dis-

cretion" entrusted to him, the reason for such deference by an appellate court disappears.' " *Brady v. Samaha* (1st Cir. 1981), 667 F.2d 224, 229, quoting *Arizona v. Washington* (1978), 434 U.S. 497, 510 n.28, 54 L. Ed. 2d 717, 731 n.28, 98 S. Ct. 824, 832-33 n.28.

The record in this case demonstrates that the judge's mistrial declaration was a "precipitate decision" where the trial court failed to consider alternatives short of mistrial and did not consult with counsel regarding any such alternatives. The judge did not scrupulously consider, employ, and find wanting possible alternatives before he made his *sua sponte* mistrial declaration. As a result, his mistrial declaration was an abuse of discretion and precludes defendant's reprosecution.

The record shows that the judge first suggested a mistrial when it was discovered that the State's working file had been submitted to the jury during deliberation. The defendant indicated he wished the jury to continue its deliberations. It appears that the State's file contained a statement from Olvera implicating defendant in the crime, police reports, witness statements, polygraph examination reports, and newspaper articles about the trial. None of this information was admissible evidence, and some of it was highly prejudicial to the defendant. The jury foreman indicated to the judge that the jurors had looked through the documents in the State's working file for about a "[h]alf hour, 20 minutes." The trial court judge asked the jurors collectively whether they would be able to reach an impartial verdict based upon the evidence admitted at trial in spite of their exposure to the matters contained in the file. The jurors responded collectively in the affirmative. The judge then reiterated to the foreman, in the presence of the jury, "As far as anything in these documents are concerned, they are extraneous because many of them are not backed up by anything. I don't know what you read or anything else. Do you understand?" The foreman replied, "Okay." The judge then ordered the jury to continue its deliberations.

Later, when the jury foreman indicated that the jury seemed unable to reach a verdict, the judge declared a mistrial "[i]n light of what went back to the jury and everything else." The trial court never stated that there was a manifest necessity for his *sua sponte* mistrial declaration. The judge also never stated which specific concerns prompted his mistrial declaration, beyond his remark regarding "what went back to the jury and everything else." From these comments, and in the context of an apparent jury deadlock, the State directs its appellate argument to two reasons for the mistrial declaration: jury deadlock and the jury's consideration of the State's working

file. Neither of these bases justified the trial court's *sua sponte* mistrial declaration over the defendant's objection.

The jury's apparent deadlock was insufficient basis to establish a manifest necessity for the trial court's mistrial declaration. Although the jury foreman indicated to the judge that the jury had been unable to reach a verdict, the trial court did not poll each juror individually to determine if he or she believed a unanimous verdict was not possible. Because of the judge's failure to question the jurors individually, there is nothing in the record to demonstrate "that the foreman's responses necessarily represented the unanimous opinion of the jury or even the majority of the panel" and thus establish a manifest necessity for the mistrial declaration. *United States ex rel. Webb v. Court of Common Pleas* (3d Cir. 1975), 516 F.2d 1034, 1044; see also *State v. Linscott* (Me. 1980), 416 A.2d 255; *State v. Pugliese* (1980), 120 N.H. 728, 422 A.2d 1319.

In addition, the trial court specifically refused defendant's request that the jury be instructed in accordance with Illinois Supreme Court precedent in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 1731. The Illinois Supreme Court's recommendation of certain instructions to a jury that may be deadlocked, as in *Prim*, adopted in pertinent part the American Bar Association's Standards Relating to the Administration of Criminal Justice. (See *Prim*, 53 Ill. 2d at 74-76.) These ABA standards and commentary amply demonstrate that the trial judge here should have offered the jury further time to deliberate, instead of abruptly ending the trial with a *sua sponte* mistrial declaration. ABA Standard 15—4.4 states:

"Length of deliberations; deadlocked jury

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(i) that in order to return a verdict, each juror must agree thereto;

(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(iii) that each juror must decide the case for himself or herself but only after an impartial consideration of the evidence with the other jurors;

(iv) that in the course of deliberations, a juror should not hesitate to reexamine his or her own views and change an opinion if the juror is convinced it is erroneous; and

(v) that no juror should surrender his or her honest convic-

tion as to the weight or effect of the evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in paragraph (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement." ABA Standards, Trial by Jury §15—4.4 (1978).

The commentary to this standard observes in relevant part that the rule "confirms that a trial judge may send the jury back for further deliberations notwithstanding its indication that it has been unable to agree. *** [A] court may send the jury back for additional deliberations even though the jury has indicated once, twice, or several times that it cannot agree or even after jurors have requested that they be discharged." ABA Standards, Trial by Jury, §15—4.4, Commentary, at 135 (2d ed. 1980 & Supp. 1986).

The commentary also notes, "The general rule is that the length of time a jury may be kept deliberating is a matter within the discretion of the trial judge, but abuse of that discretion requires reversal. The reasonableness of the deliberation period depends on such factors as the length of the trial, the nature or complexity of the case, the volume and nature of the evidence, the presence of multiple counts or multiple defendants, and the jurors' statements to the court concerning the probability of agreement." ABA Standards, Trial by Jury, §15—4.4, Commentary, at 135 (2d ed. 1980 & Supp. 1986).

With respect to subsection (c) in particular, the commentary contains these pertinent observations:

"Although the rule was contrary at early common law, the modern rule is that a trial judge has discretionary power to discharge a jury in any criminal trial without the consent of either party when, after sufficient and reasonable time for deliberation, it cannot agree on a verdict. However, just as a court may abuse its discretion by holding a jury too long, it may also abuse its discretion by discharging a jury too quickly. A too hasty discharge will bar a second trial of the defendant, unless the defendant has consented thereto.

The standard permits discharge when 'it appears that there is no reasonable probability of agreement.' *** [A] trial judge

should not discharge a jury merely because they report that they have not been able to agree, but instead should determine whether there is a reasonable prospect of their being able to agree.

One way of making this determination is through questioning the jurors." ABA Standards, Trial by Jury, §15—4.4, Commentary, at 143-44 (2d ed. 1980 & Supp. 1986).

In view of these standards and commentary, the trial judge here abused his discretion in declaring a mistrial before questioning the jurors and giving the requested instruction in accordance with *Prim*. The jurors in this case heard three days of testimony from 16 witnesses. During their deliberations, they were permitted to view numerous exhibits properly admitted at trial. The evidence of the defendant's guilt was sharply contested, and defendant presented a vigorous and, on this record, potentially effective defense that his confession had been the result of, *inter alia*, intense police interrogation and relatives who, through confrontation, sought to exculpate themselves of any involvement in the crime. Thus in order to determine defendant's guilt or innocence, the jury was charged with the responsibility of sifting through contradictory or equivocal testimony from over a dozen witnesses regarding not only the crime itself but also various significant circumstances preceding and following the commission of the offense. The jurors deliberated a few hours on the first day and in the morning and afternoon on the subsequent day. They had just begun their deliberations the following morning when the judge received the foreman's note indicating they might be deadlocked.

Under these circumstances, the trial judge, in the exercise of his discretion, should reasonably have polled the jurors individually and instructed them pursuant to *Prim* before discharging the jurors and declaring a mistrial *sua sponte* over the defendant's objection and defendant's request that the court pursue either of these avenues prior to ordering the mistrial. The trial court's only stated reason for denying defendant's request for a *Prim* instruction, a hearing on the giving of a *Prim* instruction, and the polling of the individual jurors was that either of the first two procedures would be "wasting *** time." However, manifest necessity depends upon a trial judge's scrupulous exercise of the discretion to terminate the trial prior to the jury's verdict. This cautious exercise of discretion does not permit a judge to forego important procedural safeguards merely because the judge does not want to "waste time." "[J]udicial discretion [to declare a mistrial] is *** a principled exercise of legal judgment, not a hasty

action based on personal predilection, whim or caprice. [Citation.]" *People v. Linscott* (Me. 1980), 416 A.2d 255, 261.

The State's second proffered basis for the trial judge's *sua sponte* mistrial declaration was the jury's viewing of the State's working file. However, the judge's apparent *assumption* regarding the jury's impartiality based on its viewing of the State's working file was not sufficient to establish a manifest necessity for mistrial. A trial court judge who declares a mistrial *sua sponte* "must act upon actual facts, not upon his reasonable belief." (*United States ex rel. Van Pelt v. Warden* (N.D. Ill. 1978), 461 F. Supp. 618, 621.) "Furthermore, he must canvass his alternatives and finally, make a record which shows the basis for his action so it can be reviewed." (*Van Pelt*, 461 F. Supp. at 621.) Whether the jury's apparent deadlock was prompted by its consideration of the State's working file is, on this record, total conjecture. Once the jury deadlock note was sent to the judge by the jury foreman, and confirmed by the foreman in court in the presence of the other jurors, the judge did not question the jurors, collectively or individually, to determine whether they had in fact remained impartial and unprejudiced by the matters which they had reviewed in the State's working file. As a result, the judge's decision to declare a mistrial because of "what went back to the jury" was not based upon a manifest necessity and constituted an abuse of discretion. *Cf. Arizona v. Washington* (1978), 434 U.S. 497, 54 L. Ed. 2d 717, 98 S. Ct. 824; *Brady v. Samaha* (1st Cir. 1981), 667 F.2d 224; *People v. Taylor* (1984), 101 Ill. 2d 377, 462 N.E.2d 478.

"The underlying idea [of the double jeopardy clause] *** is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense *** and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." (*Green v. United States* (1957), 355 U.S. 184, 187-88, 2 L. Ed. 2d 199, 204, 78 S. Ct. 221, 223; see also *Arizona v. Washington* (1978), 434 U.S. 497, 503-04, 54 L. Ed. 2d 717, 726-27, 98 S. Ct. 824, 829-30.) The trial judge's hasty, erroneous mistrial declaration in the case at bar was of disastrous consequence to the defendant. Retrial subjected him to the additional time, anxiety, and effort of a second prosecution. It also allowed the State to profit from its second opportunity to prosecute the defendant in order to call additional witnesses who had not testified at the first trial, to present extremely damaging information that had not been elicited at the first prosecution, and to significantly alter certain of the State's trial strategies. The underlying good faith of a trial judge does not ob-

viate the constitutional requirement that a trial court scrupulously, with utmost caution, under the most extreme circumstances, and for the most urgent and obvious of causes, exercise its discretion to discharge a jury prior to verdict. The trial judge in the instant case failed to exercise his discretion in such a scrupulous, cautious fashion. As a result the defendant's retrial violated double jeopardy, and his conviction should be reversed.

### B. DEFENDANT'S CONSENT TO THE MISTRIAL DECLARATION

The majority concludes that the defendant acquiesced in the trial judge's mistrial declaration. I disagree with this conclusion. A review of the record clearly demonstrates that defendant did not acquiesce in or consent to the trial court's mistrial declaration in the instant case.

The majority reasons that defendant's "suggestion to give the jury a *Prim* instruction [did not] constitute[ ] a timely objection" "to the trial judge's declaration of a mistrial" because a timely objection must "notify the trial judge of the double jeopardy issue, thereby giving the judge an opportunity to avoid or correct the error" and because "[a]t no time did defense counsel speak of double jeopardy during his brief colloquy with the trial judge." 168 Ill. App. 3d at 38-39.

The majority's reasoning misunderstands the defendant's whole purpose in requesting a *Prim* instruction: the defendant wanted a verdict from the jury which had heard all the evidence and already begun deliberation. By requesting a *Prim* instruction, the defendant notified the trial judge that he would not and did not agree to any mistrial declaration. The majority strains both law and logic to reach the opposite, erroneous conclusion.

The majority further reasons that defense counsel "could have raised his double jeopardy objection during [the] interval" "before the trial judge declared a mistrial." (168 Ill. App. 3d at 39.) Here the majority misconstrues the record. The "interval" to which the majority refers was, as the record indicates, no more than a few seconds; the trial judge simply decided to declare a mistrial, immediately called the jurors back into the courtroom, and abruptly discharged them. Furthermore, the defendant had already indicated, without success, that he did not want the jury discharged but instead desired the court's instruction to the jury in accordance with *Prim* and that the jury should be permitted to continue its deliberations. I cannot discern how the defendant's failure to reargue a point on which he had just been overruled could be construed as consent.

The majority's determination that defendant's "double jeopardy objection" was untimely once made is also in error. The trial judge de-

clared a mistrial on April 12, 1984. At that time, he set the matter for hearing in one week, "not for trial *** but for a trial date *and whatever motions* [the parties] might have." (Emphasis added.) (168 Ill. App. 3d at 38.) The defendant filed his motion to bar reprosecution on double jeopardy grounds in time for that hearing date set for a week later. However, the matter was continued by agreement for another week, with the express understanding that defendant's motion to bar reprosecution would be heard and ruled upon by the court on that second date. Under no reading of this record can the defendant in this case be characterized as having sat idly by to allow court errors of which he now complains. See 168 Ill. App. 3d at 39.

Finally, although the majority cites to *People v. Camden* (1987), 115 Ill. 2d 369, 504 N.E.2d 96, *cert. denied* (1987), 481 U.S.1070, 95 L. Ed. 2d 873, 107 S. Ct. 2464, it neglects to compare *Camden* to this case. Such factual comparison shows that the defendant here did not acquiesce in or consent to the judge's mistrial declaration.

In *People v. Camden*, the Illinois Supreme Court determined that under the facts of that case, "defense counsel's failure to object to the mistrial, despite having had an adequate opportunity to do so, and his course of conduct after the mistrial was declared, constituted acquiescence to the mistrial" such that "defendant implicitly consented to the mistrial." (115 Ill. 2d at 378-79, 504 N.E.2d at 100.) In reaching its conclusion that the defendant acquiesced in the trial court's mistrial declaration in *Camden*, the Illinois Supreme Court observed that defendant failed to take advantage of two opportunities to object to the court's mistrial declaration prior to the time the court discharged the jury. The court also reasoned that "defense counsel's conduct after the mistrial ruling evinces acquiescence to the mistrial." (115 Ill. 2d at 378, 504 N.E.2d at 99.) The *Camden* court noted that defense counsel waived defendant's speedy-trial demand, agreed to a second trial date, and requested substitution of judges without any objection to the defendant's reprosecution and therefore implicitly consented to the mistrial. 115 Ill. 2d at 379, 504 N.E.2d at 100.

The conduct of the defendant's attorney in the case at bar is clearly distinguishable from that of defense counsel in *Camden*. In the instant case, when it was discovered that the State's Attorney's working file had been submitted to the jury during its deliberations, defense counsel specifically requested that the jury continue its deliberations. Later, when the jury foreman indicated that the jury had been unable to reach a verdict, defense counsel suggested that the trial court judge give the jury a *Prim* instruction. The trial court refused this suggestion on the theory that it would be "wasting *** time,"

abruptly stated that he would declare a mistrial, and promptly discharged the jurors.

After the jury was dismissed, the court set the matter for the hearing of motions and arguments from the State and the defendant. The record reflects that on the scheduled date, the defendant filed his motion to bar reprosecution and enter judgment of acquittal. Defendant did not at any time waive his speedy trial demand, request substitution of judges, or agree to a rescheduling of a trial date, as defense counsel did in *Camden*. As a result, *Camden* is not authority for concluding that defendant in the instant case consented to the mistrial. The facts of this case clearly indicate the defendant did not consent to or acquiesce in the trial judge's *sua sponte* mistrial declaration.

## C. OVERREACHING BY THE STATE

I also disagree with the majority's conclusion that the record supports the trial court's determination that no overreaching occurred by the State. Where a trial court's mistrial declaration is either allowed at the request of the defendant or is supported by manifest necessity, defendant's reprosecution is precluded by double jeopardy, if the error resulting in mistrial was caused by prosecutorial or judicial overreaching. Prosecutorial overreaching occurs where the State engages in conduct intended to provoke the defendant to request a mistrial. (*Oregon v. Kennedy* (1982), 456 U.S. 667, 679, 72 L. Ed. 2d 416, 426-27, 102 S. Ct. 2083, 2091.) The determination of whether overreaching occurred depends upon factual findings to be made by the trial court judge. 456 U.S. at 675, 72 L. Ed. 2d at 424, 102 S. Ct. at 2089.

Contrary to the majority's assertion, the record does not support the trial court's factual determination that the State did not overreach. When it discovered that the jury had examined the State's working file, the judge remarked that "obviously what happened was the deputy just took the entire cart which was the whole State's file and brought it back there [to the deliberation room]." The judge also noted that he had not inspected the cart or the exhibits before the cart was taken to the deliberation room. A few weeks after the mistrial declaration, in ruling on the defendant's motion to bar reprosecution, the court concluded that "the State didn't intentionally send it back there. *** It was done by mistake."

After the defendant's second trial, the court held a hearing with respect to overreaching and the circumstances surrounding the presence of the cart with the State's working file in the jury room during jury deliberation. Testimony at this hearing shows that after the presentation of all evidence and closing arguments of counsel in the first

trial, the deputy instructed the assistant State's Attorney to place in the State's evidence cart those exhibits to be submitted to the jury. The deputy then instructed defense counsel to place defendant's exhibits in the cart, and took the cart to the jury's deliberation room. Although he was present at the hearing, the assistant State's Attorney to whom the file belonged never testified or provided any explanation for the file's appearance on the evidence cart or in the deliberation room. The trial judge did not question the attorney for such an explanation. The judge determined that the State did not act intentionally to prompt a mistrial request because some of the information in the State's file was damaging to the State's case.

On this record, there is no evidence from which the trial court could have determined whether the State's conduct was prompted by a desire to provoke the defendant to motion for a mistrial. Assuming *arguendo* that there was a manifest necessity for the trial court's mistrial declaration or that the defendant consented thereto, the trial court was not sufficiently informed to make the necessary factual determination of whether the State's conduct was designed to provoke the defendant into requesting a mistrial. I would remand the matter for hearing and factual finding by the court. See, *e.g., People v. Franklin* (1983), 119 Ill. App. 3d 899, 457 N.E.2d 1005, *appeal after remand* (1987), 159 Ill. App. 3d 56, 512 N.E.2d 40; *cf. Arizona v. Washington* (1978), 434 U.S. 497, 505, 54 L. Ed. 2d 717, 727-28, 98 S. Ct. 824, 830.

## II. POLYGRAPH EVIDENCE

The majority concludes that no reversible error occurred by the admission into evidence that Ken Fuentes submitted to a polygraph examination and by the State's reference during closing argument to Fuentes' having taken the polygraph examination. The majority reasons that no reversible error occurred because defendant "invited" Fuentes' reference to a polygraph and because the evidence of defendant's guilt is overwhelming. I disagree with both conclusions. Assuming *arguendo* that the defendant was properly retried, reversible error occurred when Fuentes was permitted to testify that he had taken a polygraph examination and the State emphasized during closing argument that Fuentes had submitted to a polygraph examination.

First, defense counsel did not "invite" Fuentes' reference to having taken a polygraph examination. The record shows that Fuentes was originally arrested by the police and interrogated regarding his involvement in the Lozano murder. Initially, Fuentes admitted to police that he had the murder weapon in his possession on the day Lo-

zano was killed. Several hours later, however, Fuentes stated that he had given the weapon to Olvera in defendant's presence, and that Olvera had returned the gun to Fuentes the day after the shooting again in defendant's presence. Defense counsel questioned Fuentes closely during cross-examination regarding Fuentes' change in his statements to the police that he had given the weapon to Olvera the day before the shooting. On re-direct examination, the following exchange occurred between Fuentes and the assistant State's Attorney:

"Q. [Assistant State's Attorney] Now, explain to the jurors what it was that triggered your memory so that you remembered you did not have that weapon?

A. [Fuentes] Well, it must have been around 12:00 o'clock on Saturday that [the police] asked me if I wanted to take a lie detector test and I said I would. So we took the lie detector test on the way back the officer was asking me are you sure that you had the gun that day and I said no, I am not really sure what happened with that gun that day and when we got back to the station one of the police officers said something about some candy apples which was then when I remembered going to Old Town and coming back and getting the gun from [Olvera] and two days prior to that of giving it to him."

Fuentes' testimony was the State's only evidence to link the defendant to the murder weapon. Under these circumstances, defense counsel had both the right and the professional obligation to cross-examine Fuentes intensely regarding his change of story to the police regarding his possession of the murder weapon on the day Lozano was shot. I fail to discern how a defense attorney's appropriate and effective representation of a client prosecuted for murder can be characterized as having "invited" an extremely damaging statement regarding inadmissible matters by a material State's witness, especially where, as here, the witness' reference to a polygraph examination was not responsive to the question put to him by the assistant State's Attorney. In *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070, the Illinois Supreme Court found prejudicial and reversible error when polygraph evidence was admitted at trial upon the defendant's stipulation and consent to the admission of the polygraph evidence. Based on this precedent, defendant here cannot be denied a new trial on the theory that he "invited" testimony showing that a material State's witness had submitted to a polygraph examination.

Furthermore, I am unable to agree that Fuentes' remark regarding polygraph and the State's pointed reference during closing argument to Fuentes' having taken a polygraph was not plain error. I

wholly disagree with the majority's conclusion that the "strength of the State's evidence" rendered these errors "harmless." 168 Ill. App. 3d at 45.

At trial, defendant attempted to cast doubt upon the credibility of the testimony of the State's witnesses in order to raise a reasonable doubt of defendant's guilt. Ken Fuentes' testimony was pivotal to the State's case against defendant, for it was Fuentes who testified that he gave his gun, the murder weapon, to Olvera in defendant's presence the day before the murder and Fuentes who testified that Olvera returned the weapon to him, again in defendant's presence, the day after the shooting. It was also Fuentes who owned the 10-speed bike upon which Lozano's killer went to and fled from the scene of the crime.

In addition, it was Fuentes who testified, although only at the second trial, that defendant often wore a baseball cap and when he did so always wore it with the brim behind his head. This fact was significant, since Ochoa could not identify defendant as the person who fled Lozano's home on the bicycle, but was nevertheless certain that the person he had seen was wearing a baseball cap with the brim behind his head. Again only during the second trial, Fuentes also testified to the effect that defendant had met Lozano one day at Fuentes' home while Lozano was campaigning for the aldermanic primary election, that defendant was unusually quiet while Fuentes spoke with Lozano in defendant's presence, and that after Lozano's departure defendant commented that Lozano "had Latin Kings working for him in the neighborhood[,] *** that [defendant] didn't like Kings coming into [defendant's] neighborhood and that someone should pay [Lozano] a visit." This encounter between defendant and Lozano was also significant to the State's case, since Lozano's wife testified that she had the impression that her husband knew or was acquainted with whoever had entered the Lozano residence and shot Lozano in the kitchen of his home. Thus Fuentes' testimony provided the connection between defendant and the assailant described by Lozano's wife and Ochoa, lent credence to details of defendant's confession, and provided a motive for defendant's commission of the murder.

Given this context, Fuentes' remark that he submitted to a polygraph was highly prejudicial to the defendant. Because this evidence was put squarely before them, and because the State made pointed reference during closing argument to Fuentes' having taken a polygraph examination, the jurors could have easily inferred that because Fuentes was a material State's witness and had taken a polygraph examination, Fuentes must have been telling the truth when he testified

at defendant's second trial.

In fact, the record reflects that polygraph evidence influenced the trial court judge in his denial of defendant's post-trial motion in which defendant raised this issue. In his oral pronouncements denying the defendant's post-trial motion, the trial judge observed:

> "THE COURT: Now the police brought them all in and inter-rogated them, as they should. And as far as the testimony about the polygraph, the only one that flunked the polygraph was him [defendant].
>
> [Defense Counsel]: Judge—
>
> THE COURT: I'm finished. I gave you an opportunity, I'm talking now. You are finished. ***
>
> There is no doubt in my mind that he [defendant] did it. I don't know who he did it with or anything else. I don't believe the entire statement [of defendant's confession] because it's not borne out by the facts."

Surely it follows that, if the trial judge was influenced by such polygraph evidence, the jurors were also influenced by it. The major-ity is in error to conclude that "the strength of the State's evidence rendered harmless the prosecutor's erroneous remark." (168 Ill. App. 3d at 45.) The State's evidence against defendant was not overwhelm-ing. Lozano's wife could not positively identify defendant's voice as that of her husband's assailant; Ochoa could not identify defendant as the offender who had passed within a foot of Ochoa minutes after the crime; the fingerprints found at the scene were not those of the defendant; the murder weapon was not defendant's; the bicycle upon which Lozano's murderer fled the scene did not belong to the defend-ant; and Fuentes, who owned the murder weapon and the bicycle, had reason to testify falsely against the defendant. Also, cross-examina-tion of State's witnesses revealed that defendant's confession, which occurred in the early morning hours after prolonged police custody and interrogation, was not a volunteered account of the crime in the defendant's own words. Rather, the confession was comprised in large part of defendant's single-word "yes" or "no" response to leading fact-filled questions put to him by his interrogators. In this context, Fuentes' testimony was crucial to the State's case: neither Olvera nor Mark Fuentes testified at defendant's second trial, and Fuentes alone linked defendant to the crime and provided the motive for defendant's commission of the offense. The jury's determination that Fuentes' tes-timony was credible was central to its finding defendant guilty of Lo-zano's murder. The prosecutor's emphasis of Fuentes' submission to a polygraph served to bolster the credibility of one of the singularly

most significant witnesses in the State's case against the defendant.

The Illinois Supreme Court has repeatedly held that reference to polygraph evidence at any stage in a defendant's trial is reversible error. Recently, in *People v. Taylor*, the Illinois Supreme Court stated:

"Lie detector tests are inadmissible in Illinois to prove either guilt or innocence. (*People v. Baynes* (1981), 88 Ill. 2d 225.) The reason is twofold. On the one hand, the results of polygraph examinations are not sufficiently reliable to be used to prove guilt or innocence. On the other hand, because of their quasi-scientific appearance, the results of polygraph examinations are likely to be given undue weight in the minds of jurors. The possibilities for prejudice are obvious; jurors will assume that the polygraph is reliable. \*\*\*

Even under the controlled and standardized conditions of courtroom procedure, the danger is too great that jurors will not understand the disclaimers, will be unprepared to evaluate the conflicting testimony of experts, will not be able to heed the admonitions of the trial judge, and will, in the end, overemphasize the polygraph results. The danger is so great that we will not allow the evidence to be produced in court even where the defendant agrees to its use. (88 Ill. 2d 225, 240, 244-45.) In *People v. Yarbrough* (1982), 93 Ill. 2d 421, we granted a new trial because the judge may have been influenced by his own suggestion of a polygraph test during consideration of a post-trial motion. As we said in *Yarbrough*, '[o]ur emphatic and unequivocal conclusion in *Baynes* that polygraph evidence is not reliable enough to be given consideration in any manner applies to its use by any participant in the trial process, whether it be by the trial judge \*\*\* or by the finder of fact, be it judge or jury.' 93 Ill. 2d 421, 426-27.

Our holdings in *Baynes* and *Yarbrough* make it unthinkable to allow jurors to be influenced by information regarding a lie detector test when it was obtained out of court. \*\*\* The nature of the information is such that the only way to be sure that a juror is not influenced by it is to insure that the juror is never exposed to the information in the first place. Once the juror believes that a law enforcement or prosecutorial decision has been based upon the results of a lie detector test, the damage has been done. \*\*\*

The problem \*\*\* does not require appraisal of the sincerity of either the jurors or the trial judge. \*\*\* The concern is that

this information about polygraphs, by its nature, is unlike other factual details. This is not the type of information which the average juror can easily ignore. Its effect is subtle and unconscious, but at the same time potent. *** [E]xposure to this type of highly inflammatory material is enough to raise the presumption of partiality [and prejudice]." *Taylor*, 101 Ill. 2d at 391-93, 462 N.E.2d 478, 485-86.

As the record in this case amply demonstrates, polygraph evidence is severely damaging and consequently inadmissible at trial. The defendant is entitled to a new trial free of any reference to Fuentes' taking a polygraph examination. See *People v. Taylor* (1984), 101 Ill. 2d 377, 462 N.E.2d 478; *People v. Yarbrough* (1982), 93 Ill. 2d 421, 444 N.E.2d 493; *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070; *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858.

For these reasons, I respectfully dissent.