THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONALD ERNEST ARMSTRONG, Defendant-Appellant.

Fourth District   No. 4—82—0058

Opinion filed January 6, 1983.

Daniel D. Yuhas and James G. Woodward, both of State Appellate Defender's Office, of Springfield, and Ruth M. Braswell, law student, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLS delivered the opinion of the court:

*Uxoricide.*

A jury found Armstrong guilty of murdering his estranged wife and he was sentenced to 25 years.

We affirm.

Since the hub and axle of this appeal is whether the evidence is sufficient to prove Armstrong's guilt beyond a reasonable doubt, a detailed recitation of that evidence is mandated.

### FACTS

Late in the evening on a Saturday night in August, Champaign County Deputy Sheriff James Stewart responded to a call for assistance at the Green Acres Apartment Complex located on U.S. Route 45 between Thomasboro and Rantoul. Upon arriving at the complex, Stewart was met by Armstrong—an Air Force sergeant stationed at Chanute AFB—and Armstrong's companion. Armstrong told Stewart he was worried about his estranged wife because he had not heard from her for over a day. Using the manager's master key, Stewart entered the wife's apartment and discovered her body in one of the bedrooms. The body was covered with a sheet to shoulder level and a nylon stocking was wrapped around her neck. The air conditioning in the apartment was off and there were no signs of forced entry. During Stewart's investigation, the telephone rang, he answered it and spoke with a male caller, who identified himself as the wife's boyfriend.

While Stewart was inside the apartment, Armstrong and his companion waited outside. Armstrong told his companion that he had

been to his wife's apartment on Thursday night to leave some flowers as a wedding anniversary present. His wife refused to allow him in the apartment so he left the flowers in front of her door and then went home. Armstrong then explained to his companion that around 9 a.m. the next morning—Friday morning—he was on his way to Thomasboro to meet with his insurance agent when he decided to stop at his wife's apartment. Armstrong said that she answered the door and after asking her whether she found the flowers he left the night before, he then asked to use the bathroom. She allowed him to enter the apartment. Armstrong told his companion that he had the impression that someone else was in his wife's bedroom because she kept the door to the bedroom closed and he thought he heard someone moving in the bed. Armstrong said that after he used the bathroom, he left his wife's apartment and proceeded to Thomasboro to meet with his insurance agent.

Evidence concerning the cause and the time of the wife's death was presented by the pathologist who performed the autopsy. He testified that when he first observed the body of the wife, she was clothed in a negligee and had dark brown pantyhose wrapped around her neck. The word "hooker" was written on her chest in red lipstick and a lipstick case was lodged in her rectum. He testified that the wife had died of acute asphyxia caused by the tightly tied pantyhose around her neck. He testified that the death most likely occurred 12 to 20 hours prior to the discovery of the body at 10:45 p.m. on Saturday.

The prosecution produced evidence to establish a pattern of circumstances suggesting that the wife was killed on Friday morning. Armstrong's mother testified that the wife was to have picked up the couple's two daughters at Armstrong's residence by 11 a.m. Friday morning to take them to their swimming lessons. The wife never came for the girls and could not be reached by telephone at her apartment. A friend of the wife testified that the wife also promised to take the friend's daughter to the 11 a.m. swimming lesson but the wife failed to show up. This was the first time the wife had ever failed to take her girls to their swimming lessons. The manager of the Timbers Nightclub—where the wife was employed as a cocktail waitress—testified that the wife was scheduled to work from 4 p.m. to midnight on Friday. She failed to appear for work and could not be contacted by telephone. The wife's boyfriend testified that he tried to reach her by telephone at her apartment Friday afternoon and again Saturday, but received no answer.

One of Armstrong's coworkers at the Chanute Air Force Base in

Rantoul testified that on Friday morning she took a telephone call for Armstrong because he was in a meeting. The caller would not leave his name, identified himself as Armstrong's insurance agent, and left a message for Armstrong to see him at the agent's house as soon as possible. At a few minutes before 9, she delivered the message to Armstrong and he left the office at approximately 9 a.m. She testified that she saw Armstrong approximately an hour later when he returned to the office. He told her that he had gone to Thomasboro to see his insurance agent but that he had been unable to find the agent's house. Evidence was introduced later that the insurance agent had neither called nor seen Armstrong on Friday morning.

The prosecution also presented testimony about the marital difficulties that existed between Armstrong and his wife. One of the wife's coworkers testified that the wife planned to leave Illinois and move to New Jersey with her boyfriend after the divorce. The wife had said that Armstrong made numerous attempts to reconcile with her but that she had no intention of going back to him. The wife's attorney testified that the court had awarded temporary custody of the couple's two daughters to the wife and had awarded temporary custody of the couple's son to Armstrong. According to the attorney, a hearing was to have been held on Friday to determine whether the wife could leave Illinois with the children. The attorney further testified that Armstrong had been aware of the wife's love affair with her boyfriend since March 1981 when Armstrong took the keys to his wife's locker at the Timbers Nightclub and discovered some love letters written to his wife from her boyfriend. In those letters, the boyfriend had referred to Armstrong's wife as a "hooker"—apparently as a term of endearment!

Walter Wolfe, an investigator with the Champaign County Sheriff's Department, testified that he was at the wife's apartment on the morning after her body was discovered, when Armstrong came to the apartment. After advising Armstrong that he was not under arrest and that he need not answer any questions, Wolfe told Armstrong that it was just a matter of time before the police could prove Armstrong killed his wife. Wolfe then advised Armstrong to tell him what happened. Armstrong asked what was in it for him if he did confess and then Armstrong said the outcome would be the same whether or not he confessed.

Armstrong, testifying in his own defense, stated that after he first learned that his wife wanted a divorce, the two of them sought the advice of an attorney but then decided to reconcile. The wife, however, changed her mind after her boyfriend came to town for a

visit. Armstrong insisted that he never gave up hope that a reconciliation between himself and his wife was possible.

Armstrong testified that on Thursday night at approximately 11:30 p.m. he took some flowers to his wife's apartment because it was their wedding anniversary. According to Armstrong, he knocked on her apartment door but she would not let him inside. He then left the flowers in front of her door and went home. The next day he went to work at the Air Force base and around 9 o'clock he received the message from his insurance agent. On the way to his agent's house in Thomasboro, he stopped at his wife's apartment to see if she had found the flowers he had left the night before. His wife answered the door and at approximately 9:10 a.m. she allowed him inside the apartment to use the bathroom. He recalled that she was wearing a negligee. He testified that after leaving his wife's apartment, he went to Thomasboro, was unable to find his insurance agent's house, and then returned to his job at approximately 10 a.m. Later that day, he tried to call his wife but received no answer. Saturday he took his children to the Illinois State Fair in Springfield. After returning home in the evening, he received a telephone call from his wife's boyfriend who expressed concern that the wife had not been answering her telephone. Armstrong then called the Champaign County Sheriff's Department and his wife's body was discovered that night.

The jury found Armstrong guilty of murdering his wife.

LAW

■ He argues that the evidence was insufficient for the jury to find him guilty beyond a reasonable doubt. The prosecution's case against Armstrong is based primarily on circumstantial evidence. In order to support a conviction based on circumstantial evidence, that evidence must be inconsistent with any reasonable hypothesis of the defendant's innocence. (*People v. Lewellen* (1969), 43 Ill. 2d 74, 250 N.E.2d 651; *People v. Holsapple* (1975), 30 Ill. App. 3d 976, 333 N.E.2d 683.) The evidence must produce a reasonable and moral certainty that the accused and no one else committed the crime. (*People v. Marino* (1970), 44 Ill. 2d 562, 256 N.E.2d 770.) If the evidence raises only the possibility that the defendant is the guilty party, he must be freed. *People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801.

■ Proof of guilt beyond a reasonable doubt, however, does not require circumstantial proof beyond any possibility of a doubt. (*People v. Murdock* (1971), 48 Ill. 2d 362, 270 N.E.2d 21.) Furthermore, every link in the chain of circumstances does not have to be proven beyond

a reasonable doubt. (*Williams*.) It is only necessary that the evidence be of a conclusive nature and, as a whole, produce, with a reasonable and moral certainty, a conclusion that the accused committed the crime. (*People v. Magnafichi* (1956), 9 Ill. 2d 169, 137 N.E.2d 256.) A court of review will not set aside a verdict based on circumstantial evidence unless the proof is so unsatisfactory that a reasonable doubt of guilt does appear. *People v. Lofton* (1977), 69 Ill. 2d 67, 370 N.E.2d 517; *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.

## REASONABLE DOUBT

The prosecution's theory of the case is that Armstrong murdered his wife between 9 and 10 a.m. on Friday morning. Basically, there are *three links* in the chain of circumstantial evidence which the prosecution presented to the jury to support that theory. *First*, the prosecution argues that the wife knew her murderer. To support this argument, the prosecution presented evidence that the doors and windows to the wife's apartment were all closed and locked. There were no signs of disturbance inside of the apartment. The manager of the apartment complex did not receive notice of any disturbance. The prosecution points out that the wife's body was found clad only in a revealing negligee and that it is unlikely that she would invite a stranger into her house dressed in such a manner. The prosecution also argues that the victim had long, painted fingernails and that none of her nails were bent back, the polish was not cracked, and there were no foreign substances under her nails. After hearing the above testimony, the jury could have reasonably determined that the wife knew her assailant.

The *second* link in the prosecution's chain of circumstantial evidence is that the victim was killed before 11 o'clock on Friday morning. The jury heard testimony that the wife failed to take her two daughters to their swimming lesson that morning and she could not be reached by phone. This was the only time the wife failed to take her girls to their swimming lesson. The wife's boyfriend tried to call her Friday afternoon and did not get any answer. She failed to report to work Friday night and could not be reached by phone. All of this testimony does point to the fact that she was murdered Friday morning.

The only evidence that does not support the theory that the wife was murdered Friday morning is the pathologist's estimate of her time of death. He estimated the time of her death to be 12 to 20 hours prior to the discovery of her body at 10:45 p.m. Saturday night. Using the pathologist's estimate, the wife's death would have had to

occur between 2:45 a.m. and 10:45 a.m. Saturday morning. The prosecution's theory has Armstrong murdering his wife between 9 and 10 a.m. Friday morning—36 to 37 hours before the discovery of her body. The pathologist stated that he was 99% certain that the wife's death could not have occurred 30 to 36 hours before the discovery of the body.

The pathologist, however, also testified that if the room was warmer than he estimated, the time of death could have been earlier. The victim was found in early August, lying in her bed, covered with a sheet, in an apartment where the windows were all closed and the air conditioner was turned off. Furthermore, the pathologist testified that after 24 to 30 hours have passed, all of the processes by which the time of death is established stop and there is no reliable way to measure the time of death until a few days have passed. Finally, the only times of death the pathologist was willing to exclude as being impossible were less than 12 hours and more than 72 hours. After hearing the above testimony, the jury could have weighed the conflicting evidence and reasonably concluded that the wife was murdered between 9 and 10 a.m. Friday.

▮ The *third* link in the prosecution's chain of circumstantial evidence is that Armstrong had a motive to murder his wife. Armstrong did not want a divorce. He made repeated attempts at reconciliation. He was upset that his wife was leaving him for another man. Armstrong knew that the word "hooker" was a term of tender affection his wife's boyfriend used to refer to her. The word "hooker" was written on the wife's chest in red lipstick. Armstrong also knew that the boyfriend had given the wife a gold wedding ring which she always wore. The ring was not on the wife's body when she was found and it was not found anywhere in the apartment. Other jewelry and cash were found in the apartment. Finally, Armstrong's explanation for his presence at his wife's apartment that Friday morning is not supported by the evidence. His insurance agent testified that he neither called nor saw Armstrong on Friday. Furthermore, it is unlikely that Armstrong would have been unable to find the agent's home because he had been there more than once before. After hearing the above testimony, the jury could have reasonably concluded that Armstrong had a motive to kill his wife and that he exercised that motive by murdering her, writing "hooker" on her chest, and removing her boyfriend's ring from her hand. After reviewing all of the links in the prosecution's chain of circumstantial evidence, we find that the jury correctly concluded that beyond a reasonable doubt Armstrong murdered his wife.

## DEFENDANT'S STATEMENT

Armstrong's second contention is that the trial court erred in admitting evidence of his statement to Detective Wolfe. Armstrong argues that the following testimony should not have been allowed:

"Q. Did you advise Sergeant Armstrong of anything else concerning your beliefs about the investigation?

A. [Detective Wolfe] Yes, sir. I advised him that it was just a matter of time before we could prove that he had killed his wife.

* * *

Q. Okay. After advising Sergeant Armstrong of your beliefs concerning the matter and suggesting that he tell you what had happened, what, if anything, did Sergeant Armstrong say?

A. He asked if he could ask me a hypothetical question.

Q. And what was your response?

A. Yes, that he could.

Q. And what, if anything, did Sergeant Armstrong say then?

A. He asked me what was in it for him if he confessed?

* * *

Q. Okay. Did Sergeant Armstrong say anything else after you told him that [no promises could be made]?

A. Yes, sir.

Q. What was that?

A. He stated whether he confessed or not the outcome would be the same."

■ We find that it was not error to admit the above testimony. Illinois follows the tacit admission rule by which silence following an accusatory statement may be considered as an admission of the charge of the accusation. (*People v. Morgan* (1976), 44 Ill. App. 3d 459, 358 N.E.2d 280.) Not only may silence be considered as an admission, but an evasive or unresponsive reply to an incriminatory, accusatory statement may also be considered as an admission of the accusation's truth. (*People v. Wright* (1965), 65 Ill. App. 2d 23, 212 N.E.2d 126.) A statement such as the present one—"what's in it for me if I confess"—is exactly the type of evasive reply that is admissible under the rule.

Furthermore, regardless of whether Armstrong's statement was a tacit admission, any possible error connected with its introduction into evidence has been waived. Although this statement was the subject of an unsuccessful motion *in limine* made by Armstrong, he failed to file a timely post-trial motion raising this issue. A motion *in limine* does

not preserve evidentiary questions for review. (*People v. Martinico* (1981), 101 Ill. App. 3d 250, 427 N.E.2d 1340.) In the absence of a timely post-trial motion, no questions are before the reviewing court except whether the conviction is based upon evidence proving the defendant guilty beyond a reasonable doubt or whether plain error exists in the record. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Koss* (1977), 52 Ill. App. 3d 605, 367 N.E.2d 1040.) We have already determined that Armstrong's guilt was proved beyond a reasonable doubt. Any error with regard to Detective Wolfe's testimony certainly does not rise to the level of plain error. It was arguably admissible under the tacit admission rule and even if it was not admissible, the evidence in this case is not so closely balanced that its admission would have deprived Armstrong of a fair trial.

Affirmed.

TRAPP and LEWIS, JJ., concur.