THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LINDA CROW, Defendant-Appellant.

Fifth District   No. 5—86—0342

Opinion filed March 30, 1988.

Daniel M. Kirwan and Julia M. Gentile, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Terence M. Madsen

and Joan G. Fickinger, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

Following a jury trial in the circuit court of Randolph County, defendant Linda Crow was convicted of the murder of her husband. She was sentenced to a term of imprisonment of 35 years. She raises three issues on appeal: (1) that she was not proved guilty beyond a reasonable doubt; (2) that the trial court erred in denying her motion for automatic substitution of judge; and (3) that the trial court considered improper factors in sentencing her.

At approximately 1:10 p.m. on December 21, 1981, the decedent, Robert Crow, was found dead in the upstairs bedroom of the home he shared with defendant and her three children. He had been shot twice with a .38 caliber revolver. One shot had entered the decedent's back at the right shoulder and exited through the right arm. The fatal shot had entered the decedent's lower back, severed the spinal cord and the abdominal aorta, and lodged in the left thigh. This shot caused instantaneous paralysis from the waist down and death probably ensued within one minute. For a portion of that minute, decedent would have had some upper body strength and mobility.

An autopsy revealed a partially digested greyish-white pasty material in the decedent's stomach, which could have been a doughnut, and fragments of a green pickle. Decedent had eaten a doughnut between 7:01 and 7:24 that morning. Fixed lividity was present when the decedent was found. Based upon the state of digestion and the fixed lividity, the time of death was established as between 9 and 10 a.m. on December 21, 1981.

The bedroom in which decedent was found was in disarray. The body was underneath a mattress and box spring. The bed had been moved across the room and was blocking entry through the main door to the bedroom; entry was gained through an adjoining bedroom. The legs of the decedent protruded from underneath the mattress and box spring. When found, decedent was lying on his back. The pathologist testified that from the position of decedent's legs, it appeared he had been on his stomach, but that he had flipped himself over after the fatal shot.

The drawers of one dresser had been pulled open and clothing, some of which remained neatly folded, was on the floor. Personal items, including money and jewelry, were undisturbed on top of the dresser. Other valuables remained undisturbed in the bedroom and the rest of the house. A pillow, in a white case, with powder burns and a

bullet hole in it, was found lying on the bedroom floor. An expert witness testified that it appeared the pillow had been wrapped around a gun when it was fired. A sheet recovered from the bed appeared to have bullet holes in it and residue around the holes. A bedspread with bullet holes in it was also found in the bedroom. Also on the bedroom floor was a clock showing a time of 9:15. The clock was found unplugged, but was operational. It was usually kept on the headboard of the bed. Two fired bullets were found on the bedroom floor, and one was found embedded in the nightstand.

A .38 caliber revolver, later identified as the murder weapon, was found on a dresser in the adjoining bedroom, partially covered by a blue T-shirt. The gun contained four spent cartridges and two live rounds. The gun had been purchased in September 1981 by defendant as a gift for her husband. The evidence indicated that defendant was proficient with a handgun. A brown pillow, normally found on the living room couch, was found in another of the upstairs bedrooms; the white bed pillow was missing from this room.

All of the police officers who were present at the scene testified that the evidence was not consistent with the commission of a burglary. There was no sign of forced entry to the home and no items of value had been taken or disturbed. A window in a door leading from the basement to the kitchen had been broken by a claw hammer from the basement side. However, there was no evidence that anyone had entered the basement. The only door thereto appeared to be frozen shut and there were no footprints in the ice outside the door. The door also had cobwebs on it which were undisturbed but which would have been broken or stretched had the door been opened. The claw hammer was found neatly placed in a tray in a toolbox near the door.

Although defendant denied that she and decedent had been having marital difficulties, there was a great deal of evidence that the marriage was in serious trouble. Decedent had been involved in a love affair with Anita Strattman, a dispatcher for the Sparta police department, since August 1981. He had told Strattman that he intended to divorce defendant and he and Strattman planned to leave Sparta together after the divorce. He gave Strattman certain personal items and cash because he did not want to lose them in the impending divorce.

Defendant denied that she knew her husband was having an affair. However, in October 1981, she telephoned another dispatcher for the Sparta police department and asked her whether the decedent "was fooling around on her." Defendant told the dispatcher that if she ever caught her husband with another woman, she would kill

them both. The dispatcher testified that defendant seemed to be serious about the threat at the time. The same dispatcher testified that defendant's daughter, Sherry, who also worked at the police department, compared the work schedules of decedent and Anita Strattman and pointed out that the two had the same days off. She called her mother and told her about the work schedules. The dispatcher testified that she had a conversation with decedent in which he stated that defendant was so jealous of him that she was driving him away.

On December 11, 1981, defendant telephoned the decedent's mother and told her not to come to Sparta for the holidays because decedent wanted a divorce and the marriage was over. Decedent's mother testified that earlier that fall, defendant had commented to her that there were two dispatchers at the Sparta police department who used to follow the police officers around. Decedent's mother testified that defendant had stated that her daughter, Sherry, knew about the couple's marital problems.

Also on December 11, 1981, defendant met her friend, Michelle Lewis, in the Wal-Mart parking lot. Lewis testified that defendant seemed upset. Defendant stated that her husband had asked her to go away for two weeks and threatened that if she did not leave the house, he would. Decedent would not even let defendant stay the night. Defendant told Lewis that it would be easier for her to handle her husband's death than to live in the same town with him and not be married to him.

Defendant then travelled with her children to the Chicago area and stayed with her sister. The sister testified that defendant did not seem upset during her stay and that her family life was not discussed.

On December 13, 1981, defendant called decedent's mother from her sister's home. Defendant asked if she could come and stay with her mother-in-law, who responded yes. However, on December 14, defendant called her mother-in-law and told her that she and decedent had agreed on a divorce, and she was returning to Sparta to settle things.

Defendant and her children returned to Sparta on December 14, 1981. On that same day, decedent received a phone call from his sister, who had heard about the marital problems. Decedent told his sister that he had asked defendant for a divorce and that there was no way to save the marriage. Decedent stated that the situation between him and defendant was very tense.

On December 17, 1981, the Sparta High School assistant principal spoke with defendant's daughter Sherry regarding her recent absence from school. Sherry told him that she had been absent because there

had been a fight between her parents and that she had needed time to think. That same day, Sherry told a Sparta high school teacher that her father had been acting strangely and that she thought it was because he was seeing another woman. She stated that her parents were going to divorce. Sherry was upset and crying when she related this.

On December 18, 1981, defendant and Michelle Lewis went out for a drink. Defendant told Lewis that her husband wanted a divorce, that he wanted defendant to sign over the title to the motorcycle to him, and he would sign over the title to the car to her. Defendant stated that she was attempting to contact an attorney in Carbondale. Defendant commented that "she found herself wishing someone would come to her and tell her that [her husband] was dead." Defendant again stated that it would be easier for her to handle her husband's death than to live in the same town with him and not be married to him.

The day of the murder, decedent, a Sparta city police officer, worked the midnight-to-8 a.m. shift. At 7:01 he radioed that he was going into the doughnut shop, where he had a cup of coffee and a doughnut. At 7:24, he radioed that he had returned to his squad car. A few minutes after 8 a.m., decedent was dropped off at his home by another Sparta city police officer. He went directly to bed.

School had been cancelled that day because of a bad ice storm the night before, so defendant let her children sleep late. She woke them sometime after decedent got home and asked them to go to the doughnut shop with her. Defendant started the car while the children got dressed. She and the children then went out and scraped the ice off the car. While the children waited in the car, defendant returned to the house to get her purse. She then returned to the car and she and the children proceeded to the doughnut shop.

The major areas of controversy in the evidence are the time defendant left her house and arrived at the doughnut shop and how long she was alone in the the house with her husband when she returned to get her purse. Charles and Mildred Downen lived next door to the Crows. Mrs. Downen testified that she was awakened at 8:10 a.m. on December 21, 1981, by the slamming of a car door. She got up, turned on the television in the living room, and went into the kitchen. Mr. Downen also got up and went into the kitchen. One of their kitchen windows faces the Crow residence, and the Downens both observed the Crow vehicle in the Crow driveway. The Downens watched the Richard Simmons show every morning at 9 a.m. They saw defendant come out and start the car shortly before 9:00—the

Richard Simmons show had not yet started. During the show, the Downens observed the defendant's children cleaning ice off the car. The Crow car was still in the driveway toward the end of the Richard Simmons show, which ended at 9:30. Mrs. Downen testified that at 9:20 she heard an unusual sound "like a boom" but did not know what it was. Mr. Downen did not hear the sound. The Crow car was still in the driveway at this time. The Downens did not see the Crow car drive away. They did not see anyone else enter the Crow residence that morning.

Penny DeLong testified that she was a patron in the doughnut shop the morning of December 21, 1981, between 8 and 9 a.m. Defendant and her children were not there at that time. At 9 a.m., DeLong left the doughnut shop for several minutes and then returned. Defendant and her children came in shortly after she returned. This was corroborated by the employee of the doughnut shop. The evidence showed that DeLong did not return to the doughnut shop until approximately 9:25. DeLong testified that defendant sat down with her and began talking to her, which was unusual because defendant would not usually talk to her. Defendant also asked DeLong where Anita Strattman (decedent's paramour) lived, which was also unusual because defendant never spoke to Anita. Defendant sent her daughter to pick up a friend although Sherry had had her driver's license for only a few months and the roads were particularly icy and hazardous.

Defendant testified that she woke the children at 8:20 a.m. and that they drove away from the house at 8:50 a.m. She is sure of this time because it was announced on the radio as they drove away. The day of the murder, defendant told a paramedic that she left the house between 9 and 9:30 a.m. Defendant testified that when she returned to the house to get her purse, she went to the bathroom to get some aspirin, walked to the kitchen to get her purse, and returned to the car. She testified that she locked the front door when she left. Two of defendant's children testified that their mother was in the house for only one minute when she returned to get her purse. They had time to listen to only part of a song on the radio while she was in the house. One of these children had earlier told the police that his mother was inside the house for approximately five minutes. Though the car was parked under the bedroom window and the radio was played low, the children did not hear any unusual noises. Defendant testified that they arrived at the doughnut shop at 8:55 a.m. She is sure of this time because her youngest daughter asked her what time it was, and she looked at the clock in the shop. The children testified

that they made a phone call from the doughnut shop shortly after 9 a.m. However, one of the children had told the police that they were not awakened until 8:50, and had arrived at the doughnut shop at 9:30. The distance from defendant's house to the doughnut shop is .6 miles.

Two defense witnesses testified that they saw defendant in the doughnut shop that morning. One testified that he saw her between 8:45 and 8:50, before defendant said she even left her house. The other said he saw her before 8 a.m., but that she was still there when he left at 9:15 a.m. Another defense witness testified that he saw children in the shop between 8:45 and 9 a.m., but that he did not know defendant.

Defendant discovered her husband's body at approximately 1:10 p.m. on December 21, 1981. Upon seeing him lying under the bed, defendant did not approach him to render aid or check his condition. She called his name several times and, when he did not respond, she directed her daughter, Sherry, to call the police. When the police arrived, defendant appeared upset and was crying. At approximately 3 p.m. that day, defendant told a Sparta police officer that she and her children had left home before 9 a.m, had left the doughnut shop at 10:30, had visited friends, had run an errand and had returned home at 1:10. Defendant's daughter Sherry discovered the broken glass. Defendant went upstairs before going into the basement.

Later that evening, while still upset and crying, defendant told another Sparta police officer that she had locked the door when she left that morning and had been the first to enter the house when they returned. She stated that she and her husband were not having serious marital problems. She stated that when she returned to the house to get her purse, she was only in the house long enough to retrieve the purse.

In a statement given on January 11, 1982, however, defendant told the same police officer that in addition to retrieving her purse, she had stopped in the bathroom to get some aspirin. She could not recall whether she had locked the door and admitted that she and decedent had been having marital problems and that she had asked him about a separation. She stated that her daughter had been the first to enter the house when they returned that afternoon. She stated that she went into the basement before she went upstairs.

The day of the murder, defendant telephoned Michelle Lewis and calmly told her that decedent had been crushed under the bed and was no longer living. Lewis later observed defendant telephone decedent's family. She was crying and shaking and stated that she had

good news and bad news: she and decedent had worked out their problems, but decedent was dead.

On December 31, 1981, defendant told decedent's sister that she had locked the door the morning of the murder and that someone had gained access through an outside basement door.

Defendant testified at her trial that she left the house at 8:50 a.m. after warming up the car and returning to the house to get her purse and take some aspirin. She locked the front door when she left. She arrived at the doughnut shop before DeLong left to run an errand. When they returned home, Sherry entered the house first and discovered the broken glass. Defendant went into the basement before going upstairs. She did not learn that her husband had been shot until the next day and assumed that he had been crushed to death by the bed.

Defendant further testified that about six months prior to the murder, decedent had begun to act strangely and seemed upset. He kept a gun near him at all times. Defendant went to Chicago at decedent's request because he said he needed time to work out some problems. Defendant and decedent were not having marital problems and had not discussed divorce. She denied making statements to Lewis about her husband's death and stated that she did not mean the threat she made to the police dispatcher about killing her husband if she caught him with another woman. Defendant did not make an appointment with an attorney and did not shoot her husband.

Neither she nor the decedent ever used the clock which had been found on the floor of the bedroom because it made a grinding noise which disturbed the decedent. The sheet found with the bullet holes was not owned by defendant.

Defendant's children's testimony corroborated defendant's testimony. They testified that defendant had only been in the house for one minute when she returned to get her purse. Their parents had not argued that morning. Both children testified that their parents did not use the clock found on the bedroom floor because it made a grinding noise. Defendant's son testified that after the discovery of the murder, he opened the outside doors leading into the basement, that they were unlocked and that when he opened them, the ice cracked.

Friends of defendant testified that she had been very upset after learning of her husband's death. Defendant never told anyone that decedent had been shot to death until after she had learned it from the police. Defendant and her husband were not having marital difficulties and appeared very happy together just days before the murder.

Defendant argues that the evidence was insufficient to prove her guilty beyond a reasonable doubt. She argues that where all of the evidence is circumstantial, as here, the evidence must not only be consistent with defendant's guilt, but must also be inconsistent with any reasonable theory of defendant's innocence. She argues that the evidence does not rule out the possibility that someone other than defendant entered the house that day and killed decedent while defendant was gone.

■ Defendant is correct that in order to support a conviction based on circumstantial evidence, that evidence must be inconsistent with any reasonable hypothesis of the defendant's innocence. (*People v. Armstrong* (1983), 111 Ill. App. 3d 471, 475, 444 N.E.2d 276, 279.) This does not mean, however, that the evidence must rule out every possible theory of defendant's innocence. Proof beyond any *possibility* of a doubt is not required; proof beyond a *reasonable* doubt is. (*Armstrong*, 111 Ill. App. 3d at 475, 444 N.E.2d at 279-80.) However, every link in the chain of circumstances does not have to be proven beyond a reasonable doubt. (*Armstrong*, 111 Ill. App. 3d at 475-76, 444 N.E.2d at 280.) The evidence need only produce a reasonable and moral certainty that the accused and no one else committed the crime. (*Armstrong*, 111 Ill. App. 3d at 476, 444 N.E.2d at 279.) A court of review will not set aside a verdict based on circumstantial evidence unless the proof is so unsatisfactory that a reasonable doubt of guilt does appear. *Armstrong*, 111 Ill. App. 3d at 476, 444 N.E.2d at 280.

■ The State's theory of the case was that defendant and decedent were having marital difficulties. Decedent had asked for a divorce and defendant knew or suspected that he was having an affair with Anita Strattman. Defendant had made numerous statements about welcoming decedent's death. Defendant killed decedent when she went into the house to retrieve her purse and while her children waited in the car. She went in, picked up the brown pillow off the couch and went upstairs. She discovered that the brown pillow would not fit easily over a gun, so she went into her son's room, dropped the brown pillow and picked up his white bed pillow. She wrapped the pillow around the gun to muffle the sound and shot her husband while he lay sleeping. Decedent dove under the bed for cover and tried to move the bed across the room to where his firearms were located. After killing him, defendant emptied dresser drawers in an attempt to "stage" a burglary. She then exited the room through her daughter's room, laying the gun on a dresser. She went to the basement and broke the window with a hammer in a further attempt to "stage" a

burglary. Defendant then took her children to the doughnut shop to establish an alibi. She sat and talked with Penny DeLong, which she had done rarely, if ever, prior to this occasion. She sent her daughter out on the hazardous roads to pick up a friend so that she could remain in the doughnut shop. When she returned home and found her husband, she did not check on his condition or render aid because she already knew that he was dead.

Defendant theorizes that someone else entered the house while she was gone and shot the decedent. There is no evidence to support this theory. Although defendant testified that she locked the door when she left, there is no evidence of forced entry. Decedent was apparently shot while he lay sleeping, so it is unlikely that he got up to let someone in the house. The Downens saw no one else enter the Crow residence that morning. The police officers testified that it did not look like a burglary scene and that it appeared to be a "staged" burglary. Decedent was shot with his own weapon which, according to defendant, had been on the nightstand by the bed within decedent's easy reach. According to defendant, decedent was a very light sleeper and the stairs leading to the bedroom creaked when walked upon.

We believe that the evidence adequately excludes the possibility that someone other than defendant entered the house and killed decedent. Instead, the evidence leads to a reasonable and moral certainty that defendant and no one else committed the crime. The jury so found, and we cannot say that the proof is so unsatisfactory that a reasonable doubt of guilt does appear. We will not disturb the jury's verdict.

■ Defendant's second argument on appeal is that the trial court erred in denying her motion for automatic substitution of judge. Section 114—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 114—5(a)) provides:

> "Within 10 days after a cause involving only one defendant has been placed on the trial call of a judge the defendant may move the court in writing for a substitution of that judge on the ground that such judge is so prejudiced against him that he cannot receive a fair trial. Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion."

It has been held that in addition to being filed within the 10-day statutory period, a motion for substitution of judge under section 114—5(a) must be filed before the trial judge rules on any substantive matter in the case. *People v. Speck* (1968), 41 Ill. 2d 177, 187, 242 N.E.2d 208, 214, *rev'd on other grounds* (1971), 403 U.S. 946, 29 L. Ed. 2d

855, 91 S. Ct. 2279.

In the instant case, an information was filed against defendant on January 11, 1982. The Honorable Judge Carl H. Becker presided over defendant's jury trial, after which she was convicted on April 23, 1982. On October 15, 1985, the Illinois Supreme Court reversed defendant's conviction and remanded the cause for a new trial. (*People v. Crow* (1985), 108 Ill. 2d 520, 485 N.E.2d 381.) Defendant was retried under the original information, the Honorable Judge Carl H. Becker presiding.

The State argues that defendant's motion was untimely because Judge Becker, who was assigned to preside over defendant's trial on remand, had also presided over defendant's first trial. Therefore he had ruled on substantive matters in the case. Defendant responds that retrial upon remand is a new proceeding for purposes of section 114—5(a), and because her motion was filed within the 10-day statutory period, it was timely.

We find this case to be nearly identical to *People v. Emerson* (1987), 122 Ill. 2d 411. In *Emerson*, the defendant was convicted of numerous offenses, including murder. His conviction was reversed on appeal and the cause was remanded to the circuit court for a new trial. On remand, the cause was assigned to the same judge who had presided over defendant's first trial. Defendant filed a motion for automatic substitution of judge within the 10-day statutory period. The trial court denied the motion as untimely because the cause was not new, but had been on the judge's trial call for a long time. The case was tried on remand under the same indictment. The Illinois Supreme Court held that the proper interpretation of section 114—5(a) is to construe the remand as a continuation of the original proceeding for purposes of the statutory provision. Therefore, the trial court did not err in denying the motion for substitution of judge.

Because Judge Becker had already ruled on substantive matters in the case, defendant's motion for substitution of judge was not timely. The trial court did not err in denying the motion.

■ Defendant's final argument on appeal is that the trial court erred in sentencing her to a 35-year term of imprisonment. Specifically, she argues that the trial court failed to consider certain mitigating factors: defendant's lack of a prior history of criminal activity, defendant's good conduct during her imprisonment following the first trial in this matter, defendant's employment and good conduct while released on bond during her second trial, and the fact that the instant crime was provoked by her husband's marital infidelity.

Defendant offered no evidence in mitigation at her sentencing

hearing. However, counsel did argue at length for a lenient sentence and vehemently argued each of the mitigating factors which defendant now claims the court failed to consider. In pronouncing sentence, the trial court stated that it had considered all of the evidence presented at trial, the presentence investigation report, the background of defendant and all of the arguments of counsel. The court made reference to the comments it had made at defendant's sentencing after her first trial and conviction and indicated that those comments still applied at defendant's second sentencing.

At the first sentencing hearing, the trial court had pointed out that defendant had no prior criminal record and had three young children. The court stated that in spite of these mitigating factors, a sentence longer than the minimum was warranted due to the cold-blooded, deliberate nature of the murder. The court pointed out that the murder had been motivated by nothing more than severe marital problems and the possibility of divorce. At defendant's second sentencing hearing, the court found that no other mitigating factors had intervened to justify a lesser sentence than 35 years' imprisonment. The record indicates that the trial court adequately considered all of the mitigating factors.

■ Defendant also argues that the trial court improperly considered two aggravating factors, one which is inherent in the offense of murder and one which was entitled to little or no weight. She argues that in its written judgment order, the trial court cited the statutory aggravating factor that the defendant's conduct caused serious bodily harm to the victim. Because serious harm is inherent in every murder, it has already been considered by the legislature in setting the penalty and cannot be considered by the sentencing court as an aggravating factor.

Defendant is correct that a factor which is implicit in an offense may not be considered as an aggravating factor at sentencing. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 267, 497 N.E.2d 1138, 1142.) However, a sentencing court may, in applying the statutory factor that the defendant's conduct caused serious harm in a murder case, consider the force employed and the physical manner in which the victim's death was brought about. (*Saldivar*, 113 Ill. 2d at 271, 497 N.E.2d at 1144.) The transcript of the sentencing hearing clearly indicates that the sentencing court properly considered the manner in which the victim's death was brought about, and not merely the fact that the defendant's conduct caused serious harm. The court repeatedly stated that the murder was a deliberate and planned act and that the manner in which it was carried out was cold-blooded and brutal. The court

considered that the victim was shot in the back while he lay sleeping in his own bed. The trial court did not err in considering the manner in which the victim's death was brought about as an aggravating factor.

■ Finally, defendant argues that the sentencing court erred in considering as an aggravating factor the need to deter others from committing similar crimes. She argues that the murder was committed while defendant was suffering an "emotional upheaval" and that deterrence is of little effect in such a situation. We point out that defendant was convicted of murder, not voluntary manslaughter. Furthermore, the trial court specifically found that the murder was deliberate and premeditated and not committed in the heat of the moment. Consideration of the need for deterrence as an aggravating factor is specifically authorized by section 5—5—3.2(a)(7) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(7)). Finally, the need for deterrence was not the sole aggravating factor considered by the trial court. See *People v. Simmons* (1985), 138 Ill. App. 3d 492, 501, 485 N.E.2d 1135, 1142-43.

A trial judge's decisions in regard to sentencing are entitled to great deference and weight and will not be altered on review absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884.) The sentence imposed is well within the statutory limits and we find no abuse of discretion. We therefore affirm defendant's sentence.

For the foregoing reasons, we affirm the judgment of the circuit court of Randolph County.

Affirmed.

HARRISON, P.J., and KARNS, J., concur.