THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. J.L. HOUSTON, Defendant-Appellant.

First District (2nd Division)   No. 1—86—2444

Opinion filed June 27, 1989.

Paul P. Biebel, Jr., Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and James E. Tyrrell, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant J.L. Houston was convicted by a jury for the murder of Ronald Bell and was sentenced to 35 years in the custody of the Department of Corrections. He now appeals his conviction and presents the following issues for review: (1) whether he was proved guilty beyond a reasonable doubt; (2) whether the trial court properly allowed the jury to view his weight-lifting belt, which was found in his car immediately after the murder; (3) whether the arresting officer's testimony regarding his search for defendant was proper; (4) whether the State's closing arguments were proper; and (5) whether the prosecution at all times acted properly during his trial.

Ronald Bell was shot 15 times at close range at about 7:20 p.m. on June 18, 1983, near the intersection of 88th Street and Harvard Avenue in Chicago. The car identified by witnesses as being used in the crime was a 1973 brown Buick Electra, which was later found to be registered to defendant.

Larry Baker testified that he resides at 451 West 87th Street, less than two blocks from the scene of the murder, and across the street from the Concorde Gas Station where Bell was employed. He and his wife were returning home in their car from grocery shopping at about 6 p.m. on the evening of the murder, when Baker noticed a brown car parked directly in front of his house. As he pulled up to his residence, Baker drove past the brown car and parked directly in front of it. As he drove past the car, and while adjacent to it, he glanced inside and saw three men he had never seen before; two men were sitting in the front seat, and one was in the back seat. After Baker parked his car,

he got out and reached into the back seat to remove his grocery bags, and as he did so, he looked through the back window of his car and into the brown car parked behind his. He again saw all three men, including the driver, who this time was keeping his head down, and defendant, who was in the back seat resting his head on either the back of the seat, or a stick of some kind. Defendant looked away when Baker looked at him. After Baker picked up his groceries, he passed between the two cars on his way into his home. When Baker reached the fence gate in front of his house, and once more looked into the car, all three men were looking across the street in the direction of the Concorde Gas Station; consequently, Baker could see only the backs of their heads. Baker then went into his house to obtain his gun, but by the time he returned outside, the brown car had pulled away and parked farther down the block on 87th Street.

A little after 7 p.m., Bell's fellow employee, Charles Anderson, was driving to his girlfriend's house at 89th and Eggleston. On 88th Street between Harvard and Eggleston, Anderson saw Bell walking, so he pulled his car over to the side of the road in order to speak with him. As they were talking, Anderson noticed a brown car which had stopped. Two men, who were dressed in work clothes and wore gloves, exited the car and walked east on 88th to Harvard; a third man remained in the car in the driver's seat. After talking with Anderson, Bell continued walking in the direction of his home—east on 88th Street toward the intersection at Harvard Avenue.

A few minutes later, at about 7:10 p.m., Verdist Poindexter was in the kitchen of his house located at the corner of 88th and Harvard. When he heard gunshots, Poindexter threw himself on the floor, crawled to a corner window facing 88th Street, looked out and saw a man run up to Bell and shoot him several times. A second man, who was down the street, yelled out, "Come on, let's go." The two men then got into a brown Buick, which proceeded west on 88th Street and continued past the viaduct there.

About an hour after he first saw the brown Buick, Baker was sitting in his dining room, when he again saw the same car return and park in front of his house. The same three men he had seen earlier got out of the car, two of whom exited from the passenger side and ran east on 87th Street. He then saw the defendant get out of the car on the driver's side, lock the car, and activate the vehicle's burglar alarm before he followed the other two men.

The police arrived within minutes of the murder. When Officers Charles Williams and Marshall Massey reached the intersection of 88th and Parnell, they found Bell's body in the street. There they

spoke with Poindexter, who provided a description of the car referred to by Baker and Anderson in their testimony. Officer Marshall then toured the area and discovered the brown Buick parked in front of Baker's house. When Officer Massey accompanied Poindexter to the car, the young man identified it as the one used in the murder.

At Officer Massey's request, evidence technicians investigated the auto and ran a registration check of its license plate. As already noted, the Buick proved to be registered to the defendant, and from it, the evidence technicians recovered three automatic weapons, two of which had empty ammunition clips inside, while the third gun was loaded. It was later determined that the bullets which slew Bell were fired from the empty weapons found in the car. Also recovered from the car was a brown leather weight-lifter's belt containing the inscription "Off. Ekuha El," which Sergeant Brannigan later testified was defendant's street name. The evidence technicians also recovered 10 fingerprints from the inside of the vehicle, including one of the defendant's prints from the rear view mirror. The weapons were also dusted for fingerprints, but none were found on any of them. The evidence technicians also determined that the car's driving column had not been tampered with. Police records also show that at approximately 11 p.m. of the day of the crime, a Mr. Houston reported that the Buick had been stolen.

Immediately after learning that the car was registered to defendant, Detective Joseph Danzl proceeded to his residence. Danzl did not locate defendant at this time, but took defendant's brother Elton Houston into custody; another codefendant, Robert M. Brown, was apprehended later. Subsequently, a stop order was placed on defendant and a nationwide warrant was issued for his arrest.

For two years after the murder, the Chicago police department attempted to locate defendant. On May 10, 1985, he was arrested in a raid in East Cleveland, Ohio, and brought back to Chicago on May 17, 1985. When he was told that he would be put in a lineup, defendant requested permission to remove the braids from his hair; and after removing his braids, he was identified by Baker.

Defendant's jury trial was held in July of 1986, at which defendant's attorney presented a motion *in limine* to preclude the State's witness, Detective Brannigan, from testifying as to a motive for the shooting, defendant's participation in the El Rukn street gang, and the recovery of defendant's weight-lifting belt which was inscribed with his street name. Defendant also sought to exclude evidence that Detective Brannigan knew defendant well enough to know his street name and evidence of the detective's investigation which led to

defendant's arrest. The court precluded the State from raising evidence of motive or defendant's involvement with the El Rukns, but allowed the introduction of the weight-lifter's belt. The court also held that the detective could testify about knowing defendant's nickname, and the State would be entitled to show that the Chicago police department conducted some investigation between the time of the murder and defendant's arrest two years later.

As previously noted, the jury found defendant guilty and he was sentenced to 35 years in prison. This appeal followed.

## I

Defendant claims that he was not proved guilty beyond a reasonable doubt, asserting that the only testimony regarding his identification consisted of Baker's testimony that he "looked like" one of the men involved in Bell's murder, and that while the identification testimony of a single witness, if positive and credible, is sufficient to convict a defendant, a conviction cannot be sustained where the testimony of the identifying witness is doubtful, vague and uncertain. (*People v. Fiorita* (1930), 339 Ill. 78, 85, 170 N.E. 690; *People v. Washington* (1970), 121 Ill. App. 2d 174, 179, 257 N.E.2d 190.) Defendant points out that, as with any element of a criminal offense, the prosecution bears the burden of proving identity beyond a reasonable doubt (*People v. Washington*, 121 Ill. App. 2d at 179), and where the witness' identification of the defendant is doubtful, vague and uncertain, the prosecution must provide some additional fact or circumstance which aids the fact finder in determining the weight to be given to the identification testimony. *People v. Washington*, 121 Ill. App. 2d at 179.

Defendant further contends that Baker did not provide a meaningful description of the man he first saw in the backseat of the car, as all he could say was that the man had braided hair and a beard, a description that would fit thousands of black men in the City of Chicago. In addition, defendant complains, Baker's opportunity to observe the man was limited: Baker had never seen the man before; during his first opportunity to observe the man, Baker was able only to get a slight glimpse of the man in the backseat as he was removing groceries from his car; and when Baker saw the man locking the car, the instance was short-lived and the distance between Baker and the car was at least 70 feet. Defendant points to the fact that two years before Baker's testimony in the case at bar, he testified at the trial of codefendants that he did not know if the man in the backseat was the same man who locked the car door and set the burglar alarm an hour

later. Defendant argues that the earlier testimony is entitled to more weight because it was given only nine months, as opposed to over two years, after the murder. Defendant concludes that since Baker's identification was similar to those offered in *Fiorita* and *Washington*, it requires the prosecution to provide additional factors which prove guilt.

Illinois courts have uniformly and consistently held that the positive and credible testimony of a single witness identifying the defendant as the offender is sufficient to support a conviction provided that he observed the defendant under conditions which would allow a positive identification to be made (*People v. McNutt* (1986), 146 Ill. App. 3d 357, 365, 496 N.E.2d 1089), and that such a finding cannot be disturbed on review unless the evidence itself is so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt. (*McNutt*, 146 Ill. App. 3d at 366.) Here, Baker observed defendant more than once in broad daylight under favorable conditions: before the murder, he observed defendant from his car, as he drove past the Buick while preparing to park; another time through the back window of his car; and at least once more after he had parked directly in front of defendant's vehicle. After the murder, he observed defendant from his house as he watched the occupants of the car return, at which time he saw defendant emerge from the Buick on the driver's side, lock the car, and activate the car's burglar alarm before he followed the other two men who were running east on 87th Street. In addition, he identified defendant in a lineup, and thrice in open court, where he stated during one such identification, that, "Yes. It looks like the gentleman seated over there," correctly noting that at the time of the killing, the defendant's hair had been braided and that he had worn facial hair.

Both *Fiorita* and *Washington* are distinguishable. In *People v. Fiorita* (339 Ill. 78, 170 N.E. 690), two of the three eyewitnesses candidly admitted that they had seen only the backs of the murderers' heads, and their testimony that the *Fiorita* defendant "looked like" one of the killers was based on such limited observation. In the case at bar, Baker observed defendant several times under extremely favorable conditions, to the extent that he was able to particularize defendant's changed appearance, and his locking the car and setting the burglar alarm after the murder. Moreover, the third eyewitness in *Fiorita* stated that he observed the murder from a distance of 200 feet, could not describe the murderer's appearance, and was dazed because the murder came as a surprise to him. Such is clearly not the situation here.

In *People v. Washington* (121 Ill. App. 2d 174, 178, 357 N.E.2d 190), the identification of defendant by complainant was doubtful, vague and uncertain, the complainant being able to say only that defendant "looked like one of them that pulled me in the thing. That is all that I can say, that he looked like him." The complainant could not identify what type of clothing defendant wore, nor could she say that the defendant hit her or was otherwise involved in a most brutal attack. The only other evidence was defendant's flight. In contrast to *Washington*, Baker positively identified defendant three times in open court and once in a lineup, accurately specified that defendant had changed his grooming since the murder, and established his presence in the car used in connection with the crime immediately before and immediately after it was committed. All of the claims defendant makes as to the evidence and the arguments he deduces therefrom were made to the jury, and as the trier of fact, they were obviously not persuaded thereby. Nor are we.

Accordingly, we find that Baker positively and credibly identified defendant and that the evidence was not so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt.

## II

Defendant contends that the weight-lifter's belt, which had his street name, "Off. Ekuha El," written on it, was in no way connected or relevant to the offense charged as it was not used in the crime, or identified by a witness as having been worn by anybody involved in the murder; hence, because it suggested that he was a gang member, it was improper to have brought it to the attention of the jury.

In his motion *in limine* to preclude the prosecution from introducing his belt into evidence, defendant stated that it would be quite possible for a juror to draw the conclusion that he was a gang member, specifically an El Rukn, from the Moslem name "Ekuha El" written on the belt. Defendant maintains that the introduction of the belt weighed heavily upon what must have been the jury's deep, bitter, and widespread fear of street gangs (*People v. Rivera* (1986), 145 Ill. App. 3d 609, 617-18, 495 N.E.2d 1088; *People v. Parrott* (1976), 40 Ill. App. 3d 328, 331, 352 N.E.2d 299), and further asserts that any juror who has lived or has grown up on Chicago's south side would most likely have some knowledge of street gangs and the El Rukns. Three jurors, in fact, fit this category; therefore, defendant reasons, given the nature of the crime, it would be quite plausible for a juror during deliberations to offer his own speculation as to motive and in doing so suggest the possibility of defendant's being a member of the

El Rukns based on the inscription on the belt. This is precisely the type of inference, defendant argues, not permitted by *Rivera* and *Parrott*; thus, defendant adds, admission of the belt was inconsistent with the trial court's concomitant ruling barring references to gangs. Considering the fact that the belt had absolutely no evidentiary value, defendant concludes, its prejudicial effect perforce outweighs its relevancy.

■ The exercise of the trial court's discretion regarding the admission of evidence will not be interfered with where the record establishes a sufficient basis for the court's decision unless there has been an abuse resulting in prejudice to the defendant. *People v. Jones* (1982), 108 Ill. App. 3d 880, 884, 439 N.E.2d 1011.

■ ■ In allowing the State to introduce the belt into evidence, the court reasoned:

> "As you say there can be additional evidence of a point, the point here being that the defendant owns the car. You have a certified—This isn't the only evidence of the fact that he owns the car but that he, perhaps, possessed it and had—was recently in it, what ever inferences may be drawn from that."

"[P]hysical evidence may be admitted where there is evidence (either direct or circumstantial) to connect the evidence to defendant and the crime." (*People v. Mathes* (1981), 101 Ill. App. 3d 205, 221, 427 N.E.2d 1269; *People v. Rogers* (1976), 42 Ill. App. 3d 499, 356 N.E.2d 413.) Here, the defendant's ownership of the car used in the crime, his presence therein, and his ownership of the belt found in the back seat of the car are all part of a set of circumstances combining to occur at the same time and in the same place, *i.e.*, immediately before and immediately after the commission of the crime and within a very short distance from the place where it was committed. At bottom, the only reason advanced by defendant for segregating any one of these established facts from the others is the prejudicial effect to the defendant resulting from their natural cohesion. That is not the law. Where the information is relevant, it is admissible despite the detriment redounding to the accused from its disclosure. (*People v. Deacon* (1985), 130 Ill. App. 3d 280, 291, 473 N.E.2d 1354.) The presence of defendant's belt in the backseat of the car used in the crime just before and just after its commission, together with his presence at that time and place, and the car being his, was all incontestably relevant evidence, and its probative value far outweighed any possible prejudicial impact. Moreover, defendant cites no authority for the proposition that a Moslem name necessarily suggests gang membership.

### III

■ Defendant next argues that the arresting officer's testimony regarding his search for defendant was improperly admitted because either direct or indirect references by the prosecution or one of its witnesses to defendant's prior criminal conduct, or that a police officer was acquainted with the defendant, constitute error. (*People v. Butler* (1974), 58 Ill. 2d 45, 49, 317 N.E.2d 35, 37; *People v. Spiezio* (1982), 105 Ill. App. 3d 769, 773, 434 N.E.2d 837; *People v. Stover* (1982), 89 Ill. 2d 189, 192-93, 196, 432 N.E.2d 262.) Defendant contends that in the case at bar, the trial court fixed the boundaries for the trial testimony of Sergeant Brannigan in response to his motion *in limine* when it ruled that although Brannigan could say that he knew defendant, he could testify only that the actions he took during his investigation were not based on any prior knowledge of defendant's activities, but were the result of what he learned during the investigation of this particular case. Defendant claims that the following exceeded the guidelines set by the trial court judge:

"Q. [State's Attorney]: And what would you do to attempt to locate him?

A. [Brannigan]: I would stop at various locations that I knew he had frequented in the past. I would talk to people he associated with and I would contact informants and see if they had any knowledge of his whereabouts.

Q. Did you have knowledge as to what his whereabouts were prior to June 18th of 1983?

A. I knew of one location where he was staying and I would see him occasionally on the street."

We hold that defendant's failure to object to this testimony of Sergeant Brannigan constitutes a waiver of this issue on review. As we have previously noted, in his motion *in limine* defendant sought to preclude the State from questioning the witness on the events leading to his arrest, arguing that the police investigation was irrelevant and prejudicial. The court held that the State should be allowed to show that the police conducted some activity regarding the investigation for the purpose of explaining the time gap before defendant's arrest. Defendant now contends that the State, in presenting its case through the testimony of Sergeant Brannigan, went beyond the boundaries set by the court. At the time of trial, however, defendant failed to object to this testimony, although he did include the issue in his post-trial motion.

■ It is a fundamental concept of our adversary system that unless errors at trial are objected to at that time, a defendant waives

the right to raise the issue in later proceedings. (*People v. Roberts* (1979), 75 Ill. 2d 1, 10, 387 N.E.2d 331.) Moreover, in order to preserve an error for review, a party must not only make an objection at trial, but he must also include the issue in a post-trial motion (*People v. Banks* (1985), 138 Ill. App. 3d 994, 1009, 486 N.E.2d 953, citing *People v. Pearson* (1981), 88 Ill. 2d 210, 217, 430 N.E.2d 990; see also *People v. Whitehead* (1966), 35 Ill. 2d 501, 221 N.E.2d 256), unless the result is so prejudicial as to amount to the defendant's not receiving a fair trial, or is so flagrant as to threaten deterioration of the judicial process. *People v. Banks*, 138 Ill. App. 3d at 1009.

■ In the case *sub judice*, the defendant failed to preserve the matter in the record when he did not object at trial; the inclusion of the error in the post-trial motion is therefore insufficient to raise the matter for our review. In any case, we do not find the testimony of Sergeant Brannigan, as set forth above, to have prejudiced defendant's right to a fair trial, nor did it threaten the deterioration of the judicial process.

Defendant also argues that since the court heard a motion *in limine* on the matter, it had two opportunities to review this issue; therefore, his failure to object should not be fatal. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695; *People v. Ocasio* (1986), 148 Ill. App. 3d 418, 503 N.E.2d 1059.) However, the cases defendant cites as authority do not support him in his argument. In *People v. Montgomery*, our supreme court mentions only in passing, and then only in the fact section of the opinion, that the defendant did not object when certain evidence was offered, but that the issue was raised in the defendant's post-trial motion. No point of law involving the failure to object or the curative effect, if any, of raising the issue in a post-trial motion appears to be raised by the parties nor is it discussed by the court. In *People v. Ocasio*, the court ruled that "the issues on appeal stem from the trial court's denial of pre-trial motions to quash arrest and suppress evidence as well as to suppress statements. Defendant was tried by the court and does not raise issues regarding trial errors in his appeal. Therefore, we find no necessity for a post-trial motion." (*Ocasio*, 148 Ill. App. 3d at 422.) Clearly, neither case addresses the issue raised by defendant in the case at bar.

■ We also find defendant's contention that his motion *in limine* preserved the issue for our review to be without merit. A motion *in limine* does not preserve evidentiary questions for review. *People v. Escobar* (1988), 168 Ill. App. 3d 30, 44, 522 N.E.2d 191; *People v. Armstrong* (1983), 111 Ill. App. 3d 471, 478-79, 444 N.E.2d 276.

## IV

■ Defendant's next argument is that the State's closing arguments were improper because they characterized him as a professional criminal when the evidence did not support such a conclusion. (*People v. Natoli* (1979), 70 Ill. App. 3d 131, 136, 387 N.E.2d 1096;*People v. Thomas* (1974), 22 Ill. App. 3d 854, 856-57, 318 N.E.2d 342.) Defendant points out that twice during the State's closing argument, it referred to Bell's murderers as professional killers, and that this theme was renewed in the State's rebuttal argument in which defendant was referred to as a "hitman who drives around in his car." Also in rebuttal, the State said "You get your car back, you can use it. Again for some other murder and you got the guns [*sic*]." Defendant asserts that all of these comments were designed to convince the jury that he was a habitual criminal, more specifically, a professional murderer. He claims that there was not one scintilla of evidence that he was a professional killer or hit man, and that under the authority of *Natoli* and *Thomas*, these statements constitute reversible error.

Defendant also alleges that the State made arguments not based on evidence in its rebuttal argument. He refers in particular to the State's suggestion that the Mr. Houston who called the police and reported the car stolen was in fact defendant, and that the defense in this case began when defendant learned that his car had been recovered by the police. He asserts that since there is no support in the trial testimony for these arguments, they are improper. *Thomas*, 22 Ill. App. 3d at 857.

We hold, however, that defendant waived this issue by failing to object to any of the above-cited allegations of error at trial. Consequently, any possible error resulting from these statements has been waived. *People v. Lyles* (1985), 106 Ill. 2d 373, 392, 478 N.E.2d 291, *cert. denied* (1985), 474 U.S. 859, 88 L. Ed. 2d 141, 106 S. Ct. 171; *People v. Gacy* (1984), 103 Ill. 2d 1, 88, 468 N.E.2d 1171, *cert. denied* (1985), 470 U.S. 1037, 84 L. Ed. 2d 799, 105 S. Ct. 1410.

## V

■ Defendant's final argument is that the prosecution acted in such a manner as to deny him his right to a fair trial. Defendant advances the theory that the claims of error he raises in the previous three sections of this opinion demonstrate that the State was possessed of a singular purpose in this case: to prejudice the jury against him, not for what he may or may not have done on June 18, 1983, but for what the State believed him to be—a habitual criminal and gang member. Defendant claims that such repeated, cumulative and singu-

lar conduct denied him his right to a fair trial, citing *People v. Rivera* (145 Ill. App. 3d 609, 495 N.E.2d 1088):

> "The question and arguments described above bespeak more than a mere overzealousness on the part of the State; rather, these actions carry a quality of purposefulness in the way facts were insinuated in cross-examination and then asserted as true in summation. These 'foul blows' cannot be countenanced consistent with the State's duty to assure a fair trial." *Rivera*, 145 Ill. App. 3d at 622.

We find defendant's assumptions to be unsupported by the record. Moreover, defendant's argument here has been fully considered previously; he advances no new reasons or authorities here. Accordingly, we fail to perceive how these alleged errors cumulatively deprived him of a fair trial any more than they did individually.

Consequently, for all of the above-stated reasons, the judgment of the circuit court is affirmed.

Affirmed.

BILANDIC, P.J., and HARTMAN, J., concur.